In re Bobbie Gene MATHIS.

Jill Jacoway, Trustee, Plaintiff,

v.

Bobbie Gene Mathis, Defendant.

Bankruptcy No. 99–80593.
Adversary No. 99–8069.

United States Bankruptcy Court,
W.D. Arkansas,
Fayetteville Division.

Nov. 15, 2000.

---

727

Colli McKiever, Fayetteville, AR, for trustee.

William Gibson, Fayetteville, AR, for Bobbie Gene Mathis.

Jill Jacoway, Fayetteville, AR, trustee.

## MEMORANDUM OPINION

ROBERT F. FUSSELL, Bankruptcy Judge.

### I. PROCEDURAL BACKGROUND

Pending before the Court is a complaint filed by Jill Jacoway, Trustee (the trustee or plaintiff), against Bobbie Gene Mathis (Mathis, the defendant, or debtor). The complaint, pursuant to 11 U.S.C. § 727(a)(2)(A), alleges that Mathis concealed or transferred property of the estate within one year prior to the filing of his chapter 7 bankruptcy with the intent to hinder or defraud creditors of the bankruptcy estate. The property that was allegedly concealed or transferred consisted of (1) real estate located in Springdale,

Arkansas, (2) two cashier's checks (one dated August 29, 1998, in the amount of $29,000.00, and one dated August 27, 1998, in the amount of $33,500.00), (3) a cash withdrawal on August 27, 1998, in the amount of $20,500.00, and (4) $30,000.00 of equipment and tools. The complaint further alleges that Mathis gave false oaths on his bankruptcy schedules and statement of financial affairs by failing to disclose the real estate transfer and the above cashier's checks, cash, and equipment and tools in violation of 11 U.S.C. § 727(a)(4). Mathis filed an answer denying any false or fraudulent intent allegations.[1]

An evidentiary hearing was held on May 26, 2000, and August 14, 2000. The Court took the matter under advisement and requested that the parties brief whether the entire transcripts of the debtor's testimony at his first meeting of creditors were admissible.

### II. JURISDICTION

Subject matter jurisdiction is conferred on this Court over the above styled adversary proceeding under 28 U.S.C. §§ 1334 and 157. The proceeding before the Court is a core proceeding as defined in 28 U.S.C. § 157(b)(2).

### III. FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO THE TRANSFER OF REAL PROPERTY, CASHIER'S CHECKS, AND CASH

#### A. FINDINGS OF FACT

Mathis filed a chapter 7 bankruptcy on April 30, 1999. In the early part of 1998,

---

1. Several days before the start of the hearing, the plaintiff filed a motion to amend her complaint to add an 11 U.S.C. § 727(a)(5) allegation to the facts asserted in her original complaint. Just before the start of the hearing, the defendant filed a Motion in Limine to strike the proposed amended complaint. The Court heard the Motion in Limine prior to the hearing on May 26, 2000, and ruled that the plaintiff would be permitted to amend the complaint to add § 727(a)(5) because no new factual causes of action were being asserted. However, the Court also ruled that because the motion to amend the complaint was filed shortly before the hearing, the defendant did not have adequate notice to prepare. The Court indicated it would continue the hearing to give the defendant a reasonable time to prepare a defense to the § 727(a)(5) allegation. At that juncture, the Court gave the plaintiff the option of withdrawing her motion to amend the complaint and proceed with the hearing, or have the Court grant the defendant a continuance to prepare a defense. The plaintiff elected to withdraw her § 727(a)(5) allegation and proceed with the hearing as to the § 727(a)(2)(A) and (a)(4) allegations contained in the original complaint.

Mathis bought a retail tire and repair shop named Bob's Tires from Jerry Vaughn. He testified he paid $20,000.00 for the business at the time. Vaughn had paid $450.00 a month for rent of the land and building where Bob's Tires was located in Springdale, Arkansas. Tim Graham (Graham) owned the land and building. Mathis continued to pay monthly rent to Graham until August 26, 1998.

On August 26, 1998, Mathis entered into a contract of sale with Graham to purchase approximately two acres of commercial real estate, including all buildings located on the property, for $450,000.00. Bob's Tires was located on this commercial property as were other commercial tenants. The contract terms provided that $5,000.00 earnest money was to be deposited with the seller and $45,000.00 in cash was to be paid by the buyer at closing. The balance of the $400,000.00 would be payable at a rate of 10% interest per annum with monthly payments beginning in September 2000 in the amount of $3,510.30 per month (which included interest) until paid in full. On August 26, 1998, Mathis signed an installment note in the amount of $400,000.00 payable to Tim and Beverly Graham, and Timothy G. and Beverly S. Graham executed a warranty deed in favor of Bob Mathis. Mathis also executed a mortgage in favor of the Grahams on the same date. The warranty deed and mortgage were filed for record in Washington County, Arkansas, on August 28, 1998.

On August 21, 1998, Bob's Tires purchased a cashier's check (No. 37490) payable to Tim Graham in the amount of $29,000.00. On August 27, 1998, Bob Mathis withdrew $20,500.00 from his personal account at United Bank. Also on August 27, 1998, Bob's Tires purchased a cashier's check (No. 37496) payable to Springdale Bank & Trust in the amount of $33,500.00.

**2.** Mathis testified that after the contract of August 26, 1998, the tenants continued to pay their monthly rental checks to Graham. The

Graham testified that his occupation is that of an investor and that he has real estate interests. Bob's Tires was located on his property at Huntsville Road and Old Missouri Road, Springdale, Arkansas. He testified that he sold the real estate and commercial buildings to Graham on August 26, 1998, and they delayed the closing until September 1998. The purchase price was $450,000.00. The property had been appraised at $475,000.00. Mathis paid $5,000.00 in earnest money to Graham and gave him a cashier's check for $29,000.00, which was $16,000.00 less than the $50,000.00 to be paid at closing. Graham testified the commercial property had several tenants who paid rent on a monthly basis. Under the contract of sale, the tenants were to pay their monthly rent to Mathis. Graham testified that he received the following payments from Mathis in addition to the $34,000.00 as set out above:

| 9/11/98 | 2 checks | $ 900.00 |
| 9/11/98 | check | $2,700.00 |
| 10/15/98 | check | $ 950.00 |
| 11/09/98 | check | $ 400.00 |
| 11/09/98 | check | $ 450.00 |
| 11/09/98 | check | $ 250.00 |
| 12/10/98 | check | $ 400.00 |
| 12/10/98 | check | $ 450.00 |
| 12/10/98 | cash | $ 500.00 |

Mathis paid Graham a total of $41,010.00. Graham testified that some of the above payments were checks from tenants to Mathis that Mathis endorsed and gave to Graham.[2] Graham testified that on December 10, 1998, Graham met with Mathis, and Mathis told him that he would not be able to make the monthly payments. Mathis agreed to execute a warranty deed to Graham at the time. Graham testified that the payments made by Mathis were not enough to reduce the principal amount of the $400,000.00 note. On December 31, 1998, Bob and Bobbie Mathis executed a warranty deed in favor of Timothy G. and Beverly S. Graham, which was filed for record on January 6, 1999, in Washington County, Arkansas.

Court credits Graham's testimony as to the payments he received from Mathis.

Mathis testified that he paid Graham $5,000.00 down on the commercial property and had a cashier's check dated August 21, 1998, in the amount of $29,000.00 payable to Graham that he gave to Graham for payment on the property. He also testified that in August, he withdrew $20,500.00 from his personal account at United Bank and paid Graham $20,000.00 in cash and kept $500.00. Mathis could not recall the circumstances of the cashier's check for $33,500.00 payable to Springdale Bank and Trust on August 27, 1998.[3]

Jason Godsey testified that about a week before August 27, 1998, Mathis approached him and told him he was closing a property sale on August 27, 1998, and needed a loan for $35,000.00 for closing costs over the weekend. Mathis told him he would pay it back on the following Monday. Godsey told Mathis he did not have the money. Mathis then told him the check did not have to be good, that he would float it over the weekend and he would get money from his IRA account and repay Godsey $35,500.00. Godsey testified that, in his ignorance, he wrote the check to Mathis, and Mathis wrote a return check to Godsey. When Godsey deposited Mathis's check, it bounced and Springdale Bank & Trust called him. Mathis then gave him a cashier's check from the bank for $33,500.00, and $2,000.00 in cash to repay the loan of $35,000.00. The extra $500.00 was for floating his check.

Mathis testified that in December 1998, he could not make the monthly payments on the property so he agreed to deed the property back to Graham. He further agreed that Graham was entitled to keep the money Mathis had paid on the property. Mathis said he did not want the costs of litigation and foreclosure. Mathis admitted he had a friend forge his wife's signature on the December 31, 1998, warranty deed and had this signature notarized. He stated he did not want to get his wife involved.

Mathis also testified that he had an IRA account when he worked for Wal–Mart; that he withdrew $28,000.00 from that account on January 8, 1998, in the form of cashier's check No. 38941; and, on the same date, he deposited the $28,000.00 into savings account No. 5308 in his name at United Bank. The Court received into evidence a copy of savings account No. 5308 statement from 9/30/98 to 11/01/98 in the name of Bobbie G. Mathis, which reflected a balance of $28,562.76. Mathis testified that he withdrew this money to pay the operational expenses of Bob's Tires. The Court also received into evidence a copy of the Mathises' 1998 tax returns, which reflect business income of $66,787.00 and distributions from IRA accounts of $42,366.00.

The Court received into evidence a copy of the debtor's schedules and Statement of Financial Affairs filed April 30, 1999. Schedule "A," Real Property, reflects 1 acre of land with a fair market value of $7,000.00. Schedule "F," Creditors Holding Unsecured Non–Priority Claims, lists Tim and Beverly Graham, 2468 N. 56th Street, Springdale, AR 71762, as creditors for a 1997 business loan for business property. It states the amount of the claim is $1.00, and is contingent, unliquidated, and disputed.

The following questions and answers are reflected on the debtor's Statement of Financial Affairs:

Item 5 *Repossessions, foreclosures and returns*

List all property that has been repossessed by a creditor, sold at a foreclosure sale, transferred through a deed in lieu of foreclosure or returned to the seller, within one year immediately preceding the commencement of this case.

---

3. Cashier's check No. 37496 dated August 27, 1998, remittor Bob's Tires, in the amount of $33,500.00 and payable to Springdale Bank and Trust, was deposited to the account of Jason Godsey on August 27, 1998 (Joint Exhibit No. 1).

Answer–None.

Item 10 *Other Transfers*

List all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within one year immediately preceding the commencement of this case.

Answer–None.

The Statement of Financial Affairs contained the following statement above the debtor's signature: "I declare under penalty of perjury that I have read the answers contained in the foregoing statement of financial affairs and an attachment thereto and that they are true and correct." Mathis admitted that he signed the Statement of Financial Affairs and gave the information contained in the statement to Mark Denniston, his attorney, who had the information typed in final form. The debtor testified that because of his limited formal education he could not read well and his wife read for him.

Jill Jacoway testified she was appointed as the Chapter 7 Trustee in the debtor's case and reviewed the petition, schedules, and Statement of Financial Affairs. Those documents failed to disclose the real estate purchase of $450,000.00 from Graham; the cashier's check dated August 21, 1998, in the amount of $29,000.00 payable to Tim Graham; the cashier's check dated August 27, 1998, in the amount of $33,500.00 payable to Springdale Bank & Trust; and the withdrawal by Mathis from his checking account on August 27, 1998, in the amount of $20,500.00. The Trustee further testified that her administrative assistant found out about the transfer of property from Graham to Mathis that occurred on August 26, 1998, and the retransfer of property from Mathis to Graham that occurred on December 31, 1998, by viewing deeds of real estate conveyances on a daily basis on the Internet.

Linda Parnell testified that she is a real estate agent, manages commercial and residential properties, and occasionally is employed by chapter 7 trustees in bankruptcy cases to perform bookkeeping tasks and review debtors' records. She was hired by the plaintiff to review the records turned over by Mathis. She testified that as a real estate agent she views conveyances of real estate by deeds daily on the Internet. She discovered the August 26, 1998, conveyance by Graham to Mathis and the December 31, 1998, conveyance by Mathis to Graham in this manner.

Mark Denniston testified that he represented Mathis in his bankruptcy case, but not in the pending adversary proceeding. Denniston testified that Mathis told him he had a lawsuit pending against him and decided to file bankruptcy.[4] Mathis came to Denniston's office and Denniston gave him a set of forms to fill out after first explaining the forms to him (at the time, he did not know Mathis could not read). He told Mathis to take the forms home, fill them out, and bring them back. Denniston further testified that the information in the bankruptcy forms reflected Mathis had a business named Bob's Tires, and he thought Mathis was renting the building. When discussing this with Mathis, Denniston was under the impression he was voluntarily returning Bob's Tires business to Graham. He also believed Mathis had an option to purchase the business from Tim Graham. Mathis did not tell him that he had purchased the real property and a commercial building from Graham for $450,000.00, nor that they had a contract of sale and that warranty deeds had been conveyed and a mortgage executed. Because Denniston thought that Graham had given Mathis only an option to purchase, and Mathis was not going to exercise the

4. The debtor's Statement of Financial Affairs Item 4 reflects two law suits were listed at the time the debtors filed bankruptcy: (1) Chris Eubanks v. Bob Mathis d/b/a Bob's Tires, CIV 98–1325, Washington County Circuit Court; (2) Nola Kettle v. Bob Mathis d/b/a Bob's Tires, CIV 99–60–1, Cleburne County Circuit Court.

option, he did not list the transaction on the Statement of Financial Affairs, Item 5; instead, he thought the business transaction should be discharged so he put the information Mathis had given him under Section "F," Unsecured Creditors, and listed Graham's claim as a claim for a business loan for business property. Mathis had told him that it was a handshake deal. Denniston testified that at one of the creditor's meetings he learned that Mathis could not read. Later, he found out that Mathis's wife had read the petition to him. He further testified that he never had any idea that Mathis was lying to him; that he believed Mathis was being as honest as he could, and, upon reflecting further on the matter, Mathis probably did not comprehend or have an understanding of the papers. Denniston further testified that he believed what Mathis had told him to be true.

Bobbie Jean Mathis testified that she did not have anything to do with the real estate transaction with Graham. She testified her husband could not read and had a bad memory. She went to Denniston's office with her husband and, later, read the papers to her husband, wrote down what he told her, and gave the papers back to attorney Denniston.

## B. CONCLUSIONS OF LAW

### 1. *11 U.S.C. § 727(a)(2)(A)*

11 U.S.C. § 727(a)(2)(A) states:

(a) The court shall grant the debtor a discharge, unless—

 (2) the debtor, with the intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

 (A) property of the debtor, within one year before the date of the filing of the petition;

The burden of proof is upon the objecting party to prove all elements of the statute setting forth the grounds for denying discharge. *See Ray v. Graham (In re Graham)*, 111 B.R. 801, 805 (Bankr. E.D.Ark.1990). The relevant standard for proof in a § 727 case is by the preponderance of the evidence. *See Barclays/American Bus. Credit, Inc. v. Adams (In re Adams)*, 31 F.3d 389, 393–94 (6th Cir. 1994); *see also Farouki v. Emirates Bank Int'l*, 14 F.3d 244, 250 n. 17 (4th Cir.1994); *In re Beaubouef*, 966 F.2d 174, 178 (5th Cir.1992); *In re Serafini*, 938 F.2d 1156, 1157 (10th Cir.1991).

To meet their burden of proof under § 727(a)(2)(A), the objecting party must show:

(1) a transfer of property occurred;

(2) the property was property of the debtor;

(3) the transfer occurred within one year of the filing of the petition; and

(4) the debtor had, at the time of the transfer, intent to hinder, delay, or defraud a creditor.

The element of intent to deceive involves a two-part inquiry. First, the debtor's actual intent must be found as a matter of fact from the evidence presented. "Constructive intent cannot be the basis for the denial of a discharge...." *Lovell v. Mixon*, 719 F.2d 1373, 1377 (8th Cir.1983). However, "[w]hen the creditor introduces circumstantial evidence proving the debtor's intent to deceive, the debtor 'cannot overcome [that] inference with an unsupported assertion of honest intent.'" *In re Van Horne*, 823 F.2d 1285, 1287 (8th Cir.1987) (quoting *In re Simpson*, 29 B.R. 202, 211–12 (Bankr.N.D.Iowa 1983)). Because a debtor rarely admits to a fraudulent intent, the objecting party must generally rely on a combination of circumstances that suggest the debtor harbored the necessary intent. *Id.*

In order to determine whether fraud has occurred (because fraud is rarely

demonstrated by direct evidence) the courts generally look to certain factors, or "badges of fraud," to make the determination of the existence of a fraudulent intent. These factors are whether,

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all of the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Ark. Code Ann. § 4–59–204(b)(1)–(11) (1996); *see also Brown v. Third Nat'l Bank (In re Sherman )*, 67 F.3d 1348 (8th Cir.1995); *Graven v. Fink (In re Graven )*, 936 F.2d 378, 383–84 n. 8 (8th Cir.1991); *United States v. Johnston*, 245 F.Supp. 433 (W.D.Ark.1965).

██ All of the above factors do not have to be met in order to find fraud. *See Sherman*, 67 F.3d at 1355 (five badges of fraud is sufficient); *Bank of Sun Prairie v. Hovig*, 218 F.Supp. 769 (W.D.Ark.1963) (four badges is sufficient). It is not the number of badges, but the "confluence of several [that] can constitute conclusive evidence of an actual intent to defraud." *Sherman*, 67 F.3d at 1354.

██ The plaintiff has met her burden of proof required under 11 U.S.C. § 727(a)(2)(A) as to the following elements. First, a transfer of property occurred: on August 26, 1998, the debtor bought the subject property from Graham, and on December 31, 1998, the debtor transferred the subject property back to Graham. Second, the subject property that the debtor transferred to Graham on December 31, 1998, was owned by the debtor at the date of transfer. Third, the debtor filed a voluntary Chapter 7 bankruptcy case on April 30, 1999, and the transfer in question took place on December 31, 1998—within the one year statute of limitations.

The fourth element of proof requires that the debtor have, at the time of the transfer, an intent to hinder, delay, or defraud a creditor. While the circumstances surrounding the transfers are suspect, the Court is persuaded that the evidence fails to establish by a preponderance of the evidence that the debtor made the transfers of the subject property, and the payments to Graham prior to the transfer, with a fraudulent intent to defraud a creditor or the debtor's estate.

In making this determination, the Court considered the "badges of fraud" identified under Arkansas law. First, the transfer was not to an insider. The evidence establishes that the transfer was to Graham, who is not a family relative, a business partner, or connected with the debtor in any other business. Second, based on the evidence, the Court is convinced the contract of sale on August 26, 1998, between the debtor and Graham was legitimate and there was no side deal between the parties to transfer the property back to Graham at a later date. Third, the evidence does not establish that the debtor retained possession or control of the property transferred after the transfer. Fourth, the December

31, 1998, transfer of the subject real estate from the debtor to Graham was not concealed. The debtor executed a warranty deed to Graham on December 31, 1998, which was filed for record on January 6, 1999, in Washington County, Arkansas. While the debtor admitted he had his wife's signature forged on the deed, there is no evidence that Graham knew about the forgery at the time. Fifth, the evidence establishes, and the Court will credit the debtor's testimony, that the debtor could not afford to make the monthly payment under the contract and decided to let go of the subject property in December. The debtor was in default under the contract in December 1999. Sixth, the Court is also persuaded that Graham would have started foreclosure of the debtor had he continued to fail to make his payments under the contract. Seventh, the evidence establishes that the transfer of the subject property was substantially all of the debtor's business assets; only machinery and tools remained. Eighth, the debtor did not abscond. Ninth, the debtor's conduct in regard to the demise of his business tools and inventory is in issue; however, the Court is not sufficiently convinced that the debtor's actions tend to establish a pattern of conduct to reflect that the subject transfer of the real estate was fraudulent. Tenth, the value received for the transfer was reasonably equivalent to the value of the asset transferred. The evidence is undisputed that the debtor bought the subject property for $450,000.00, and it had been appraised as having a fair market value of $475,000.00.

Even though the debtor has only a sixth grade education and is limited as to his reading skills, he is street smart and intelligent. While approximately $41,000.00 in payments over a four month period on a $450,000.00 purchase price seems to be more than substantial, there is no question the debtor was in default under the terms of the contract. Mr. Graham drove a hard bargain in favor of himself. The Court can not conclude, based on the evidence, that the sale of the property by Graham to Mathis, and the subsequent transfer of property back to Graham by Mathis four months later, was fraudulent. Neither can the Court conclude, based on the evidence, that the payments made by Mathis to Graham on the Bob's Tires sale were fraudulent transfers without consideration given. The Court will enter an order dismissing these § 727(a)(2)(A) allegations.

### 2. *11 U.S.C. § 727(a)(4)*

11 U.S.C. § 727(a)(4)(a) states:

(a) The court shall grant the debtor a discharge, unless—

 (4) the debtor knowingly and fraudulently, in or in connection with the case—

 (A) made a false oath or account;

Again, the burden of proof is upon the objecting party to prove all elements of the statute setting forth the grounds for denying discharge. *See Graham*, 111 B.R. at 805. The relevant standard for proof is by the preponderance of the evidence. *See Adams*, 31 F.3d at 393–94; *see also Farouki*, 14 F.3d at 250 n. 17; *Beaubouef*, 966 F.2d at 178.

 To meet their burden of proof under § 727(a)(4), the objecting party must show:

(1) the debtor made a statement under oath;

(2) the statement was false;

(3) the debtor knew the statement was false;

(4) the debtor made the statement with fraudulent intent; and

(5) the statement related materially to the bankruptcy case.

*Oldendorf v. Buckman*, 173 B.R. 99, 105 (E.D.La.1994) (citing *In re Beaubouef*, 966 F.2d 174, 178 (5th Cir.1992)); *see also In re Smith*, 161 B.R. 989, 992 (Bkrtcy. E.D.Ark.1993).

 In order for a "false oath or account to bar a discharge, the false statement must be 'material.'" *Mertz v. Rott*,

955 F.2d 596, 598 (8th Cir.1992) (citing *In re Olson,* 916 F.2d 481 (8th Cir.1990)). A false statement is material if it "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Id.* (quoting *In re Chalik,* 748 F.2d 616, 618 (11th Cir.1984)); *see also Palatine Nat'l Bank of Palatine, Ill. v. Olson (In re Olson),* 916 F.2d 481, 484 (8th Cir.1990).

■ The "statement must be known by the debtor to be false [or omission is known] and be made [or not made] with an intent to defraud." *Smith,* 161 B.R. at 992. While the intent must be actual, intent may be proven by circumstantial evidence or by inferences drawn from the debtor's course of conduct. *See In re Jones,* 175 B.R. 994, 1002 (Bankr. E.D.Ark.1994) (citing *McCormick v. Security State Bank,* 822 F.2d 806, 808 (8th Cir.1987)).

■ The complaint alleges that the defendant made a false oath in violation of § 727(a)(4) by knowingly and fraudulently omitting on his Statement of Financial Affairs transfers of property—specifically, the payments made to Graham, and the deeding of real estate on December 31, 1998, to Graham. A failure to disclose information that is material to the administration of the bankruptcy estate has been held as a basis for a false oath in violation of § 727(a)(4). *See Cepelak v. Sears (In re Sears ),* 246 B.R. 341 (8th Cir. BAP 2000).

■ Based on the evidence, this Court is convinced that the debtor willfully and deliberately omitted the transfer of his (and his wife's) ownership of real estate to Graham by way of a warranty deed dated December 31, 1998, from his Statement of Financial Affairs to conceal the circumstances surrounding the transfer from the chapter 7 trustee. The transfer involving the subject property, which had been sold by Graham to the debtor for $450,000.00, and then conveyed back by the debtor to Graham approximately four months later,

and the payments made on the subject property, are material matters to the administration of the bankruptcy estate. These transfers are matters that would put the trustee on notice to investigate for possible fraudulent conveyances or preferential transfers, and are required not only to be disclosed, but to be adequately disclosed so the trustee will be able to identify the nature of the transfer.

Item 5 of the Statement of Financial Affairs requires that the debtor disclose property that has been transferred through a deed in lieu of foreclosure. The debtor marked "none" as his answer to this inquiry, which he signed under penalty of perjury. The Court credits the debtor's attorney, Mark Denniston's, testimony that Mathis came to Denniston's office and Denniston gave him a set of bankruptcy forms to fill out after explaining the forms to Mathis. He testified that Mathis gave him the impression that Mathis had a business named Bob's Tires and was renting the building from Graham, with an option to purchase the building. Mathis did not tell Denniston he had a written contract to purchase the real estate from Graham for $450,000.00, had given Graham a note and mortgage and Graham had deeded the property to Mathis, or that Mathis had deeded the property back to Graham. Mathis told Denniston the transfer was a hand shake deal. Denniston further testified that because Mathis told him that he was not going to exercise his option to purchase the property, Denniston did not list the transaction under Item 5 of the Statement of Financial Affairs, and, instead, thought the transaction should be listed under Schedule "F," Unsecured Non-priority Claims, as a disputed $1.00 claim.

The information the debtor gave his attorney about the real estate transfers in issue was materially false and constituted a wilful concealment of the true facts by the debtor. It is clear that the debtor did not make an honest and full disclosure of the August 26, 1998, contract of sale, or

the December 31, 1998, transfer of the subject property to his attorney, much less the chapter 7 trustee. The debtor's intent to conceal the circumstances surrounding the December 31, 1998, transfer of his and his wife's ownership in the subject property is obvious-he had a copy of the contract of sale, promissory note, mortgage, and deed to the property, and executed a deed to release the property. The Court believes the debtor deliberately concealed the transfer because, as he testified, he had his wife's name forged on the warranty deed and did not want her involved in the sale and reconveyance of the subject property. The debtor is not a credible witness.

Counsel for the debtor argued there was no intent to defraud a creditor by failing to disclose the subject transfer because the debtor did not gain anything from the transaction. What the debtor knowingly did in this case, with the intent to conceal from the trustee, was to fail to tell his attorney that he had ownership and title to a $450,000.00 real estate parcel, and that he transferred it to Graham in a matter of months before filing his bankruptcy petition. The trustee testified, and her testimony is creditable, that she learned about the debtor's transfer of the subject property to Graham from Linda Parnell, who had run a deed search on the Internet. "The petition, including schedules and statements, must be accurate and reliable, without the necessity of digging out and conducting independent examinations to get the facts." *Mertz*, 955 F.2d at 598 (interior quotation marks omitted). The reference in the debtor's Schedule "F" to a business loan for business property is misleading and not true. It is not a disclosure that the debtor had owned real estate that he purchased for $450,000.00 and then deeded back to the seller within five months of the purchase. Simply stated, the transfer and circumstances leading up to the transfer on December 31, 1998, are suspect and the debtor knew his answer

"none" as to item 5 of his Statement of Financial Affairs was a false oath. He intentionally failed to disclose the transfer to the trustee and his testimony as to the payments he purportedly made to Graham, and his failure to recall the circumstances of the $33,500 cashier's check made payable to Springdale Bank & Trust, substantiate his reluctancy to disclose this transfer to the trustee by omitting it from his Statement of Financial Affairs. A transfer of property valued at least at $450,000.00 is material, and this is exactly the type of information that must be disclosed in order to insure the trustee has an opportunity to inquire about, and investigate, the debtor's estate. The Court finds the trustee has established by a preponderance of the evidence the debtor violated 11 U.S.C. § 727(a)(4) in this instance by intentionally making a material false oath as to the December 31, 1998, transfer. The Court will enter an order denying the debtor's discharge pursuant to 11 U.S.C. § 727(a)(4).

## IV. FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO THE FAILURE TO DISCLOSE, OR CONCEALMENT OF, EQUIPMENT AND TOOLS OF BOB'S TIRES

### A. FINDINGS OF FACT

Sometime in early 1998, the debtor purchased Bob's Tires, a small retail tire store and repair shop. The debtor testified that the sale price of $20,000.00 was for the equipment located at the business. The equipment was used at the time he bought it. He testified, based on his recollection, that he purchased the following equipment, tools, and inventory: two office desks, a calculator, phone, five tire balancing machines, a tire changing machine, four tire racks, two air compressors, two generators, a tire spreading machine, two sets of aluminum wheels, and new and used tires.[5]

---

**5.** The debtor had no written inventory of the equipment, tools, and tires at the date of

purchase.

Terry Stamps testified that he is an assessment auditor for Washington County, Arkansas, and that when he began his job, he attended school and received training in appraising personal property for tax purposes. He received no specific training on evaluating equipment and tools of a tire business. Generally, when a new business opens, he will go to the business operation and evaluate the personal property of the business for tax purposes. Stamps testified that in the summer of 1998, he went to Bob's Tire, met the debtor, and observed the equipment and inventory on the premises. Stamps testified that, as a rule, he will accept the value that the owner of the business places on the personal property located at the business.

On July 17, 1998, Stamps prepared a Commercial Personal Property Assessment Form, 1998. He listed inventory, with a purchase price of $400.00; furniture/fixtures consisting of two desks, one compact refrigerator, sofa, phone, and adding machine, with a combined purchase price of $135.00; and machinery/equipment consisting of shop equipment (automotive tools), with a purchase price of $30,000.00. On the assessment form, Bob Mathis was listed as the owner of a tire business called Bob's Tires. The following statement is contained on the form, with signatures:

I hereby swear or affirm that this is a true and complete list of all the personal property that, by law, I am required to list for taxation, and that the values rendered are true and accurate to the best of my knowledge.

Signed by Bob Mathis, as Owner on July 17, 1998. "Sworn before and subscribed to before me this day." Signed by Terry Stamps as Assessor, Deputy or Notary.

The debtor testified that the values he placed on the personal property assessment were determined by either what he paid for the property or the value he decided to place on the property. He testified that he purchased the shop equipment consisting of automotive tools for $20,000.00. He said that he over-valued the personal property at the time of filling out the assessment form, and that he must have been acting like a "big shot." He further testified that the equipment and tools were stolen on several occasions while he was in business. This personal property was not insured. He did not report the thefts to the police because he suspected that his son may have stolen the property, and he did not want the police to investigate the thefts because it would have to involve his son. He also said he did not disclose the thefts on his bankruptcy schedules for the same reason.

The Court also received the following documents into evidence:

1. Schedule "B" of the debtor's voluntary petition, which reflects, in part, the following information:

| | | |
|---|---|---|
| (27) | Machines, fixtures, equipment, supplies: tire balancing machine | 4,000.00 |
| (28) | Inventory: Tires & Tire Racks (left over from business) (3 racks @ $50 each, 6 misc. tires @ $300) | 450.00 |
| (33) | Other personal property of any kind not already listed. Itemize: Tools (hand tools and small power tools for keeping up trucks and business) | 150.00 |

2. A list of the "inventory of shop as of 9/30/98":

| | | | |
|---|---|---|---|
| New Tires | Remington Maximum: | 4,095.32 | |
| | Dayton: | 197.92 | |
| | Firestone: | 240.60 | |
| | Total: | | 4,533.84 |
| Used Tires | Total: | | 3,000.00 |
| Grand Total: | | | 7,533.84 |

3. The Statement of Financial Affairs Item 8, which reflects the following:
 Losses–None.

The debtor admitted his signature on the Statement of Financial Affairs was under penalty of perjury.

4. A letter dated September 8, 1999, from the debtor's attorney to the trustee that states: The Debtor is agreeable to turning over the following at your convenience:
 (Estimated Value)

| | |
|---|---:|
| Tire balancing machine | 2,000 |
| Tires and tire racks | 225 |
| Tryke molds | 500 |
| Tools | 150 |

The trustee testified that she employed Cecil Phillips to auction the non-exempted personal property of the debtor. Cecil Phillips was employed by the trustee to auction the non-exempted personal property of the debtor. He testified that he made four visits to the Mathis home, and had a list of the personal property Mathis had put on his bankruptcy schedules. He was asked by the trustee to do an appraisal on the personal property owned by Mathis. When Phillips went into the Mathis residence, Mathis told him the furniture belonged to his wife. Mathis took Phillips to the storage shed behind the house, and then to the shop building. Phillips observed numerous items of personal property, including tires, two tire balancing machines, lawn mowers, tire racks, a double wide trailer, and a small amount of power tools and wheels. Over the course of four visits to the Mathis property, Phillips picked up those items for later auction. Mathis testified that Phillips did not require him to turn over the hand tools valued at $150.00 that Mathis claimed as exempted.

The Court received into evidence the "Final Settlement" statement by auctioneer Cecil Phillips, dated October 10, 1999, reflecting the sale of the personal property items turned over by Mathis. The items that were sold, and the proceeds from the sale, are as follows:

| | | | |
|---|---:|---|---:|
| Flatbed Trailer | 4500.00 | Tire Racks | 15.00 |
| Mower | 300.00 | Gate | 55.00 |
| Panel | 45.00 | Panel | 27.50 |
| Wire Panel | 12.50 | Frame | 25.00 |
| Gate | 30.00 | Panel Gate | 120.00 |
| Panel | 65.00 | Trailer | 2300.00 |
| Dual wheels | 100.00 | Wheels | 10.00 |
| Tires | 17.50 | Tires | 35.00 |
| Tires | 5.00 | Tires | 30.00 |
| Tires | 7.50 | Tire Balancer | 700.00 |
| Set Tires | 100.00 | Tires | 45.00 |
| | | Total | 8600.00 |

## B. CONCLUSIONS OF LAW

### 1. 11 U.S.C. § 727(a)(2)(A)

The complaint alleges that the debtor, on or about July 21, 1998, assessed his personal property (automotive tools) at $30,000.00, and later concealed or transferred these tools with an intent to defraud a creditor in that the debtor did not disclose the existence or whereabouts of these tools on his bankruptcy petition or schedules. The Court adopts its statement of law as set forth in this opinion III. B. 1., located at page 10 of this opinion.

The language contained in plaintiff's complaint asserting a violation of § 727(a)(2)(A) is couched in terms of asserting a violation of § 727(a)(4), a false oath—the debtor did not disclose the existence or whereabouts of these tools on his bankruptcy petition or schedules. At best, the language seeks to allege a concealment of automotive tools at the time of the filing of the petition and schedules. The evidentiary problem is that there is a *failure to identify* what automotive tools were concealed by the debtor. The plaintiff assumes that because the debtor listed automotive tools having a purchase price and assessed value of $30,000.00 on his 1998

Commercial Property Assessment, and that the personal property turned over by the debtor to the trustee sold for only $8600.00, the debtor must have concealed items of personal property. There simply is no identity or proof of what automotive tools were concealed in violation of § 727(a)(2)(A). The 1998 Commercial Property Assessment form does not identify specifically the automotive tools that were valued at $30,000.00 by the debtor. The only specific items identified that the debtor had at the start of his business in August 1998 were the items he testified that he had at the time he started his business—two office desks, a calculator, phone, five tire balancing machines, a tire changing machine, four tire racks, an air-compressor, two generators, a tire spreading machine, two sets of aluminum wheels, and new and used tires.

On a related matter, the debtor's Schedule "B", Inventory of Shop, dated September 30, 1998, reflects the value of new and used tires at $7533.84. The auction sale final settlement reflects sales of tires in the amount of $277.50, indicating a substantial reduction in tire inventory. However, the evidence does not establish if these tires were sold in the ordinary course of business, or stolen or transferred without consideration. The auction sale final settlement also reflects that a tire balancing machine that was originally valued at $4000.00 on the debtor's schedules, and $2000.00 on his amended schedules, sold for only $700.00 at the auction. Most of the remaining items the debtor identified at the start of his business were sold at the auction as reflected by the final settlement statement of the auctioneer.

While this Court does not believe, nor does it credit, the debtor's testimony that the automotive inventory and tools were depleted by reason of two thefts of inventory, without proof as to the identity of the inventory in the first instance, the evidence is insufficient to identify what automotive inventory and tools were either concealed or transferred within one year of the bankruptcy in violation of § 727(a)(2)(A). This Court would have found a violation of § 727(a)(5) if the cause of action had been timely alleged in the complaint because the debtor failed to explain satisfactorily the demise of his automotive tools and tire inventory. However, the Court cannot sustain a violation of § 727(a)(2)(A) in this instance because the preponderance of the evidence fails to identify sufficiently the assets the plaintiff alleges were concealed by the debtor. The Court will enter an order dismissing this § 727(a)(2)(A) allegation.

### 2. *11 U.S.C. § 727(a)(4)*

The plaintiff asserts the following allegations in support of her § 727(a)(4) false oath violation:

### COUNT III–MAKING A FALSE OATH

24. The Debtor signed his original and amended bankruptcy petition and schedules under oath.

25. That the Debtor asserted that all statements contained within said petition and schedules were true and correct.

26. That the Debtor knowing concealed transfers of substantial amounts of property and sums of money from the Trustee by failing to disclose the transfers upon the petition.

27. The Debtor knowingly and fraudulently failed to report the transfers of the property upon his bankruptcy petition and schedules.

28. The Debtor's discharge should be denied because of the Debtor's knowing and fraudulent failure to reveal the occurrence of the transfers of property and the existence of property that qualifies as property of the estate.

The Court concludes that the plaintiff has failed to establish by a preponderance of the evidence that the debtor gave a false oath on his bankruptcy petition and schedules as to the automotive

tools and tire inventory at the date of the filing of his petition and schedules on April 30, 1999. First, the factual allegations of the complaint as to alleging a false oath regarding automotive tools are not specific or identified in the complaint. The complaint does not mention any false oath given by the debtor about his automotive tools; it only asserts that the debtor knowingly concealed *transfers* of substantial amounts of property and sums of money from the trustee by *failing to disclose the transfers* on the petition. These transfers apparently refer to the transfer of the debtor's real property and the money payments he made to Graham.

The Court adopts and incorporates its statements of law found in III. B. 2., located at pages 14 and 15 of this opinion. The plaintiff failed to identify at trial what automotive tools the plaintiff alleged false statements were made, or the debtor failed to disclose, on the debtor's schedules. The debtor disclosed on his schedules a tire balancing machine, tire racks, tires, hand tools, and, on his amended schedules, a detailed inventory of new and used tires valued at $7533.54. The debtor turned over to the trustee trailers, which sold for $4500.00 and $2300.00; a tire balancing machine, which sold for $700.00; and numerous items of inventory and personal property including tires, tire rack, wheels, tire balancing machine, and other items, which sold for $8600.00.

The trustee, in her pre-trial brief, asserted that the debtor gave a false oath by not disclosing that there had been thefts of automotive tools or personal property until the first meeting of creditors. The debtor failed to disclose these thefts on his Statement of Financial Affairs under losses. Even assuming the thefts occurred (and the Court does not), and the debtor did not

report the theft on his Statement of Financial Affairs, the proof in the record is void as to the identity of the missing automotive tools and personal property. Furthermore, there is no proof as to the value of the missing automotive tools or personal property. Without value, the Court cannot establish whether the debtor made a false oath, and whether that false oath was, in fact, a material false oath. *See Mertz,* 955 F.2d at 598.

Again, the trustee premises a violation of § 727(a)(4) on the demise of the value of the debtor's automotive tools without establishing proof as to the identity of the assets the debtor failed to disclose on his petition, schedules, and Statement of Financial Affairs constituting false oaths. The Court will enter an order dismissing this § 727(a)(4) allegation.[6]

---

**6.** The Court rules that the entire tapes or transcript of the debtor's testimony given at his first meeting of creditors is not admissible. The plaintiff has failed to establish that the *entire testimony of the debtor* is relevant, or that the testimony consists of inconsistent statements or admissions against interests.

While the first meeting tapes or transcript may contain inconsistent statements with the debtor's testimony at the hearing, the credibility of the debtor has been amply determined by this Court in this opinion.