**In re Eddie Varnold HAMILTON, Debtor.**

**Nancy Hamilton, Plaintiff,**

**v.**

**Eddie Varnold Hamilton, Defendant.**

**Bankruptcy No. 2:05–bk–27197M.
Adversary No. 2:06–ap–1119.**

United States Bankruptcy Court,
E.D. Arkansas,
Helena Division.

June 16, 2008.

Phyllis M. Jones, Lax, Vaughan, Fortson, McKenzie & Rowe, Little Rock, AR, for Plaintiff.

T. David Carruth, Attorney at Law, Clarendon, AR.

## MEMORANDUM OPINION

JAMES G. MIXON, Bankruptcy Judge.

On October 14, 2005, Eddie Varnold Hamilton (Debtor) filed a voluntary petition for relief under the provisions of Chapter 7 of the United States Bankruptcy Code. Warren E. Dupwe was appointed the Chapter 7 Trustee in the case.

On March 31, 2006, Nancy Hamilton (Plaintiff) filed a complaint against the

Debtor in which she objected to the general discharge under 11 U.S.C. § 727. In her complaint the Plaintiff also asked the Court to determine that the specific debts owed to her are nondischargeable pursuant to 11 U.S.C. § 523(a)(6) (debts incurred by willful and malicious injury by a debtor to the property of another) and 11 U.S.C. § 523(a)(15) (debts to a former spouse incurred by a debtor in connection with a property settlement). Additionally the Plaintiff sought a determination of nondischargeability under the provisions of 11 U.S.C. § 523(a)(2)(A)(debts incurred through false pretense, false representation or actual fraud).

Trial on the merits was conducted in Helena–West Helena, Arkansas, on June 28 and 29, 2007, and the matter was taken under advisement. Each party has submitted a post-trial brief.

The proceeding before the Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and (J), and the Court has jurisdiction to enter a final judgment in the case. The following shall constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## I.

### BACKGROUND

The Plaintiff and the Debtor were formerly husband and wife. They were married for more than 17 years and were divorced in early 2005 after a protracted divorce proceeding that lasted almost two years. The Plaintiff currently lives in an apartment in Ozark, Arkansas, and the Debtor lives in Hazen, Arkansas. (Tr. at 275.) The parties' marital home was in Franklin County, near Ozark, Arkansas, at the time the divorce petition was filed.

In 1994, the Plaintiff was involved in an automobile accident and as a result received a personal injury settlement of approximately $554,000.00. (Tr. at 176–77.) The Plaintiff testified that the Debtor spent most of the settlement in one year on a failed tractor dealership opened in 1997 and closed in 1998. The only money left from the settlement is $708.21 in a joint stock and bond account at the Bank of America.

As a result of the accident, the Plaintiff suffered a brain injury. She described it as "a closed head injury, four to five layers deep in the brain." (Tr. at 181.) She suffered some disability as a result of the accident but is not currently receiving any social security disability payments. Following the accident, the Plaintiff was unemployed until a few days before the trial, when she obtained a job as an apartment manager. The claims the Plaintiff has against the Debtor arise out of the divorce proceedings mentioned previously.

## II.

### OBJECTION TO DISCHARGE

#### 11 U.S.C. § 727(a)(4)

The Plaintiff objects to the Debtor's discharge, alleging that the Debtor knowingly and fraudulently made a false oath or account in or in connection with his bankruptcy case. The Debtor admitted signing the petition and schedules after reviewing them and testifying at the first meeting of creditors that he listed all of his debts and all property in which he held an interest.

#### A.

### FACTS

The Court has reviewed the record and makes the following findings of fact with regard to the Plaintiff's various allegations related to her objection to the Debtor's discharge.

## 1.

*House on 337 Carter Street,*
*Clarendon, Arkansas*

The Debtor scheduled an ownership interest in this property as a one-third interest valued at $4,500.00. He listed his interest as an exempt homestead using the federal exemption contained in 11 U.S.C. § 522(d)(1). The Debtor's petition provided that he inherited the property from his father.

None of this information is true. The home was originally purchased in 1996 for between $18,000.00 and $20,000.00 by the Debtor and the Plaintiff when they were married, and it was purchased from the Debtor's mother with proceeds from the Plaintiff's personal injury settlement. (Tr. at 175). The Plaintiff transferred her interest in the property to the Debtor in February 2006 as part of the divorce property settlement agreement filed in February 2005. The Debtor owns a 100% interest in the property and not a one-third interest.

The Monroe County, Arkansas, assessor's records, admitted without objection, indicated that the assessor's opinion of the value of the property for the year 2006 is between $34,800.00 and $34,700.00. (Pl.'s Ex. 4.) The Debtor also lists $250.00 "rent or home mortgage payment" on Schedule J although he owns the property in fee simple and no creditor is listed as holding a mortgage lien in the property. (Pl.'s Ex. 1.) The Debtor testified that the property is his personal residence and that it is listed for sale for $20,000.00.[1]

The Debtor stated that when he scheduled the property, he thought he had agreed with the Plaintiff that she would transfer her interest in the property to the parties' two children. It is true that the quitclaim deed transferring the Plaintiff's interest in the property to the Debtor was not filed until after the bankruptcy petition was filed. However, the Plaintiff disputes that there was ever such an agreement. Moreover, the divorce decree, entered of record on February 15, 2005, specifically requires the Plaintiff to transfer her interest in the property to the Debtor. (Pl.'s Ex. 9 at 4.) Counsel for the Debtor makes no argument concerning this property in his brief.

## 2.

*$1,000.00 Check Payable to*
*the Debtor's Mother*

The Debtor's schedules contained a Statement of Financial Affairs requiring the Debtor to list all payments to creditors within one year of filing the petition, certain gifts made within one year, and all other property transferred within one year of the petition. The Debtor answered "none" to all three questions. (Pl.'s Ex. 1 at 20–21, Questions 3, 7, & 10.)

The Plaintiff introduced Check Number 878 drawn on the Debtor's bank account dated October 13, 2004, payable to Mary Hamilton, the Debtor's mother, for $1,000.00. The check bore the notation "loan payment" on its face. (Pl.'s Ex. 7B.) The check cleared the Debtor's bank on October 18, 2004, according to the stamp on the back of the check. The petition was filed on October 14, 2005. The Debtor admitted in the Request for Admission Number 4 that he paid Mary Hamilton $1,000.00 "within one year of the date the bankruptcy petition was filed." (Tr. at 321; Pl.'s Ex. 29.)

---

**1.** The Debtor testified and otherwise represented that the Clarendon property is his personal residence to which he is entitled to an exemption, but he also testified, inconsistently, that he lives in Hazen, Arkansas. (See Tr. at 275.) Teddie Hamilton, his son, also testified he resides with his father in Hazen.

The Debtor testified that the $1,000.00 was to pay his mother back for bailing him out of jail and for paying his attorney. He stated also that he still owes his mother money, although she is not listed on his petition as a creditor. The Debtor never addressed the reason the transfer was not listed. Despite the evidence admitted into the record, including the answers to requests for admission, Debtor's counsel, in his brief, makes the following argument:

> Plaintiff asserts that $1,000.00 delivered to Mary Hamilton was a payment of a loan or payment to an insider. Yet at trial, the defendant testified that this $1,000.00 was bond money his mother put up to get him out of jail on the animal cruelty charge and was erroneously refunded to him by the sheriff when the case was dismissed. In order for the Plaintiff to prevail on her claim on this point she must establish that the $1,000.00 was owned by the defendant which she has not. The closest she has come is to show that it went through the joint account of Mr. Hamilton and Ms. Boren.

Def.'s Post Trial Brief.

The record contains no testimony by anyone that "the $1,000.00 was bond money ... erroneously refunded to him by the sheriff when the case was dismissed."

### 3.

### *Operating a Business*

Question 18 of the Statement of Financial Affairs asks the Debtor to name the "[n]ature, location and name" of any business he operated within six years of the date the petition was filed. (Pl.'s Ex. 1 at 23.) The Debtor answered "none" to this question. However, the Debtor's 2005 tax return reflects that the Debtor operated a business named "Hamilton Trucking" with gross receipts for 2005 of $65,838.00. The Debtor, in response to counsel for the Plaintiff's questions on direct examination, admitted that he was operating a business. (Tr. at 37.)

The Debtor testified in his case in chief that he drives a truck and is under contract with Riceland Foods. Under this arrangement, he owns his own truck and pays his own expenses. However, the Debtor did not introduce evidence of the contract in question, which he also referred to as a lease, and offered no other testimony about his business.

Regarding the Debtor's omissions related to operating a business, the Debtor's counsel argues in his brief, "[a]t the trial he testified that ... he worked exclusively for Riceland who arranged his loads and directed his activities." (Defendant's Post Trial Brief.) However, the record does not contain the testimony counsel refers to in his argument. (*See* Tr. at 294.)

### 4.

### *Transfer of 1998 Dodge Ram*

The Debtor testified that he sold a 1998 Dodge Ram in mid-November 2004 in order to "pay Nancy, pay my attorney ..." (Tr. at 41.) He filed the petition for bankruptcy on October 14, 2005. The Debtor acknowledged that he may have sold the vehicle in January 2005 because he made a deposit of $5,000.00 on January 10, 2005. (Pl.'s Ex. 7E.) Either date would have been within one year of the date the petition was filed. Yet the Debtor answered "none" to Question Number 10 on his Statement of Financial Affairs which asked the Debtor to list all transfers of property made within one year of the date the petition was filed.

Counsel for the Debtor admits the statement was "inaccurate," but claims it was the only inaccuracy. (Defendant's Post Trial Brief.) Counsel makes no other argument in defense of the Debtor's omission.

**5.**

*Income*

Schedule I of the petition requires the Debtor to state his current income. In his petition, he described himself as a self-employed trucker and listed monthly income as $1,561.00, less $400.00 a month payroll taxes and social security for a net monthly income of $1,161.00. His Schedule J lists monthly expenses at $2,032.33, including $250.00 a month mortgage or rent payment.

However, the income and expenses stated on Schedules I and J are inconsistent with the Debtor's tax return for 2005, dated March 5, 2006. (Pl.'s Ex. 34.) The 2005 return lists an adjusted gross income of $9,580.00, which equals $798.33 per month. The return also reflects no income tax withheld, no tax due, and the availability of an earned income credit of $3,830.00 that resulted in a tax refund of $2,374.00. In his response to Question 17 on Schedule B of the petition, the Debtor indicated he did not anticipate a tax refund. No subsequent amended schedule has been filed to reflect the tax refund he received after filing his 2005 tax return. Schedules I and J do not reflect the Debtor's business income of $65,838.00 and expenses of $55,530.00 listed on the tax return under Schedule C Profit or Loss from a Business.

The Debtor does not address the inconsistencies between the tax return and Schedules I and J except to argue that any discrepancies are minor and that "[d]ebtors ... are not required to provide audited financial statements...." (Defendant's Post–Trial Brief.)

**B.**

*APPLICABLE LAW*

The Bankruptcy Code provides in relevant part that "[t]he court shall grant the debtor a discharge unless ... the debtor knowingly and fraudulently in or in connection with the case ... made a false oath or account...." 11 U.S.C. § 727(a)(4) (2006).

■ To prevail in a complaint brought pursuant to 11 U.S.C. § 727(a)(4)(A), the plaintiff must establish that (1) the debtor made the statement under oath; (2) the statement was false; (3) the statement was made with fraudulent intent; (4) the debtor knew the statement was false; and (5) the statement related materially to the debtor's bankruptcy. *Jacoway v. Mathis (In re Mathis)*, 258 B.R. 726, 735 (Bankr.W.D.Ark.2000)(citing *Oldendorf v. Buckman*, 173 B.R. 99, 105 (E.D.La.1994)(citing *In re Beaubouef*, 966 F.2d 174, 178 (5th Cir.1992); *In re Smith*, 161 B.R. 989, 992 (Bankr.E.D.Ark.1993))).

■ The plaintiff has the burden of proving facts essential to an objection to discharge by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). However, once a creditor has introduced evidence that the debtor committed any of the prohibited acts, the debtor has the burden of coming forward with the evidence to explain his conduct. *Ramsay v. Jones (In re Jones)*, 175 B.R. 994, 997 (Bankr.E.D.Ark.1994)(citing *Jolles v. Freedman (In re Freedman)*, 693 F.2d 50, 51 (8th Cir.1982)).

■ The Bankruptcy Code requires debtors to fully complete the schedules and statements of affairs under oath. *Korte v. Internal Revenue Service (In re Korte)*, 262 B.R. 464, 474 (8th Cir. BAP 2001); *Cepelak v. Sears (In re Sears)*, 246 B.R. 341, 347 (8th Cir. BAP 2000)(citing 28 U.S.C. § 1746). Statements made with reckless regard to the truth are regarded as intentionally false. *In re Korte*, 262

B.R. at 474 (citations omitted); *Bold City VII, Ltd. v. Radcliffe (In re Radcliffe)*, 141 B.R. 1015, 1021 (Bankr.E.D.Ark.1992).

■ Omissions from the schedules qualify as a false oath if they are made knowingly and with fraudulent intent. *In re Sears*, 246 B.R. at 347(citing *Mertz v. Rott*, 955 F.2d 596, 598 (8th Cir.1992)); *In re Baldridge*, 256 B.R. at 289; *Ray v. Graham (In re Graham)*, 111 B.R. 801, 806 (Bankr.E.D.Ark.1990).

■ A debtor rarely admits fraudulent intent; therefore, the objecting party must rely on a combination of circumstantial evidence that suggests the necessary intent. *In re Jones*, 175 B.R. 994, 1002 (Bankr.E.D.Ark.1994)(citing *McCormick v. Security State Bank*, 822 F.2d 806, 808 (8th Cir.1987.)) The debtor cannot then overcome that inference with an unsupported assertion of honest intent. *In re Mathis*, 258 B.R. at 733 (citing *In re Van Horne*, 823 F.2d 1285, 1287 (8th Cir.1987)).

■ The statement or omission is material if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property. *Mertz v. Rott*, 955 F.2d at 598; *In re Sears*, 246 B.R. at 347.

## C.

### DISCUSSION

■ The facts in this case are reminiscent of the facts in *Wildlife Farms II, LLC. v. Robinson (In re Robinson)*, 368 B.R. 818 (Bankr.E.D.Ark.2007) and the case of *Daniel v. Boyd (In re Boyd)*, 347 B.R. 349 (Bankr.W.D.Ark.2006) where the Court observed:

> The statements made by debtors on their prescribed petitions and schedules are required to be verified under penalty of perjury, and thus have the force and effect of an oath. *In re Sears*, 246 B.R. at 347 (citing 28 U.S.C. § 1746). The court in *In re Sears* noted that the harsh penalty meted out by 727(a)(4)(A), the denial of a discharge, is necessary to bolster the administration of bankruptcy cases. *In re Sears*, 246 at 347 (citing *Mertz v. Rott*, 955 F.2d 596, 598 (8th Cir.1992)). The statute promotes truth-telling in the statements and schedules so that creditors and trustees will not have to resort to independent investigation and fact-finding. *Mertz v. Rott*, 955 F.2d at 598. These goals of the statute are fully realized when the debtor fully complies with the requirement that he or she make an accurate disclosure of creditors and assets. *North River Ins. Co. v. Baskowitz (In re Baskowitz)*, 194 B.R. 839, 843 (Bankr.E.D.Mo.1996). Whether or not a violation of the statute has occurred, the question of the debtor's knowledge and intent is a matter of fact. *In re Sears*, 246 B.R. at 347 (citing *In re Olson*, 916 F.2d 481, 484 (8th Cir.1990)).

*In re Boyd*, 347 at 355.

In the instant case, the Debtor has made numerous misstatements of fact on his bankruptcy petition by either not stating the facts correctly or omitting answers to questions about his assets. Although the misstatement of facts on the petition were established and the burden shifted to the Debtor to explain his conduct, the Debtor, in his testimony and brief, made very little effort to explain the discrepancies. See *In re Robinson*, 368 B.R. 818 (debtors' discharge was denied after scant effort was made to explain the numerous false statements and omissions on their bankruptcy petitions); *Ramsay v. Jones (In re Jones)*, 175 B.R. 994 (Bankr.E.D.Ark.1994)(debtor's discharge was denied after unpersuasive arguments were made by debtor's

counsel and debtor would only testify to his name, invoking his Fifth Amendment privilege).

Given the number of false statements and omissions by the Debtor on his bankruptcy petition, none of the information on the petition can be considered reliable. The evidence establishes by the required preponderance of the evidence that the false statements and omissions were made under oath knowingly, intentionally, and with fraudulent intent. The false statements were material as they bear a relationship to the Debtor's estate and concern the discovery of assets, the Debtor's business activities, and the disposition of the Debtor's property.

Therefore, the discharge of *Eddie v. Hamilton* will be denied pursuant to 11 U.S.C. § 727(a)(4)(A).

## III.

### WILLFUL AND MALICIOUS INJURY TO PLAINTIFF'S PROPERTY

#### 11 U.S.C. § 523(a)(6)

The Plaintiff alleges that the Debtor willfully and maliciously injured horses that were awarded to the Plaintiff in the Divorce Decree and that the Debtor had agreed to care for during an interim. She further alleges that the injury caused her monetary damage. The Plaintiff asks for a nondischargeable judgment in the sum of $40,840.00. The debt asserted by the Plaintiff has not previously been liquidated.

The Debtor denies that he willfully and maliciously injured the Plaintiff's horses, and he disputes the amount the Plaintiff claims as damages.

### A.

#### FACTS

A divorce decree entered on February 15, 2005, dealt with the custody, care, and ownership of certain horses owned by the parties during their marriage.

The divorce decree awarded the Plaintiff the following property:

> The van, utility trailer, stock trailer, 3 mares, 3 colts, 1 stud, all paperwork relating to the horses, and all tack and saddles for the horses ... The parties agree that the utility trailer, stock trailer, three (3) mares, three (3) colts and one(1) stud, shall be held by [Debtor] for a reasonable time until the [Plaintiff] is able to take possession of, or sell, said property. The parties have agreed that the horses shall continue to be taken care of, and fed, by the [Debtor] until the [Plaintiff] takes possession of, or sells, said horses. That the parties agree that a reasonable time to accomplish this exchange of possession of the horses is approximately sixty (60) days.

(Pl.'s Ex. 9 at 2–3.)

According to the testimony of the Plaintiff and Dianna Ladd, the Plaintiff's attorney, the actual divorce hearing was held on December 14, 2004. Ms. Ladd stated that by the time of the hearing on December 14, 2005, the only issue remaining unresolved was the division of property and debts and that these issues were settled by mutual agreement. She stated both parties and counsel were present at the hearing. She said that after the parties reached an agreement, the case was called and the attorneys read the agreement into the record and that the divorce decree accurately reflects the agreement. (Tr. at 86–87.)

Ms. Ladd testified that at that time the Debtor stated that "the horses were fine, that they were being cared for, that they were in Hackett, Arkansas." (Tr. at 89.) Part of the reason the Plaintiff wanted 60 days before she took possession of the

horses was because the Plaintiff was "all but impoverished ... she was living on $600.00, approximately, a month social security income ... she needed also the 5,000.00 dollars" lump sum payment from the Debtor that was part of the original settlement. (Tr. at 89.) Furthermore, the Plaintiff was disabled and did not have the ability to transport the horses.

Ms. Ladd testified that after the hearing on December 14, 2004, in early January 2005, the Debtor, through his attorney, advised that the place where the horses were being kept by him was no longer going to be available. She further testified that "they made a demand that Ms. Hamilton pick up the horses immediately and arrange for possession of them." (Tr. at 93.) Ms. Ladd stated that she told the Debtor's attorney that Ms. Hamilton was unable to pick up the horses and that Ms. Hamilton would hold the Debtor to his sixty-day agreement. Ms. Ladd said she filed a petition to enforce the agreement.

Regarding this issue, Ms. Ladd wrote the court a letter that included the following information:

> Mr. Rush is now advising that his client does not intend to honor the 60 days that my client has to move or sell the horses and is demanding that she remove the horses by January 17, 2005 and that he refuses to be responsible for them after that time. Based on the anticipated breach of contract, my client has filed a motion for contempt ... which is now pending.

Defendant's Ex. 11.

At the hearing on February, 15, 2005, held pursuant to the petition to enforce the agreement Ms. Ladd filed, the decree was finally entered of record. On that date the Debtor delivered to the Plaintiff a $5,000.00 check that was provided for in the decree. (Tr. at 95.)

Thereafter, the Plaintiff set out to take possession of the horses, which were located in Sebastian County, Arkansas. The afternoon after the hearing on February 15, Ms. Ladd received a call from one of the deputy sheriffs responsible for animal control, requesting her to assist her client in taking possession of the horses.

Ms. Ladd testified that when she arrived she viewed a horrific scene. Some of the horses were dead, and others were so malnourished they could not stand. All of the horses were in extremely poor condition. Ms. Ladd took pictures at the site and testified about her observations. (See Pl.'s Ex. 10.) Her description of a dead colt was particularly compelling:

> A little bit further down the pasture, I found another horse. [Pl's Ex. 10–3] It was a young colt that was—that was dead. Didn't look like it had been dead very long. The only thing that really had been decayed was a—its eyes were hollowed out ... Yes, that's it [referring to a picture of the colt marked as Plaintiff's Exhibit 27]. That colt, if you look where its feet are, you can see how long it sat there and rocked with its feet trying to move and get up. It had worn quite an indentation in the ground from rocking.

Tr. at 98.

Ms. Ladd filed contempt charges against the Debtor on February 22, 2005, (Def.'s Ex. 7) but did not proceed with the petition because criminal charges were filed against the Debtor in the District Court of Sebastian County for cruelty to animals. (Pl.'s Ex. 25.) The Debtor was convicted of the charges, and he appealed his conviction to the Circuit Court of Sebastian County.

The circuit court case was concluded by some type of informal probation not clearly shown by the record. The Debtor testi-

fied that he neither pleaded guilty nor was adjudicated guilty.

The Plaintiff testified that several of the horses initially survived, but one of the survivors, a pregnant mare named Eureka, was later euthanized. Her foal was stillborn. Ginger, another pregnant mare, survived but also delivered a stillborn foal. Sapphire, another pregnant mare, was never found. Also surviving was a stallion named Digger and two unnamed fillies. The Plaintiff testified that the surviving horses were taken to a "safe house" and nursed back to health. (Tr. at 154.) The Plaintiff testified she was billed $4,512.00 for the care of the horses. She was without resources to pay the charges and, therefore, conveyed the horses, stock trailer and horse tack in satisfaction of the bill.

The Plaintiff argues she should be compensated in the following amounts that represent the value of the horses, equipment, and tack:

### NANCY HAMILTON'S DAMAGES
### FOR WILLFUL AND MALICIOUS INJURY TO PROPERTY

| | |
|---|---:|
| Eureka—Black Mustang Mare | $ 2,000 |
| 1 stillborn (Eureka's baby) | 1,000 |
| Ginger—Brown Horse | 1,500 |
| 1 stillborn (Ginger's baby) | 1,000 |
| Sapphire—Brown Horse | 1,500 |
| 1 Unborn foal (belonged to Sapphire that was never found) | 650 |
| 1 colt (found dead) (Sapphire's foal) | 1,000 |
| 2 1-1/2 year old fillies @ $1,500 each | 3,000 |
| Stallion "Digger" | 20,000 |
| Alamo Saddle | 2,600 |
| Saddle | 1,075 |
| Saddle | 1,195 |
| Tack [See list immediately below] | 1,820 |
| Horse Stock Trailer | 2,500 |
| TOTAL DAMAGES | $ 40,840 |

#### Horse Tack in Stock Trailer

| | | | |
|---|---|---|---:|
| Saddle Blankets | Pad Western/Poly Fleece | 4 @ $40.50 each | 162.00 |
| Snap, SW/Eye | 7/8×4″ | 6 @ $ 4.35 each | 26.10 |
| Rope PolySBraid | $.92 per foot | 48 ft. × $.92 | 44.16 |
| Spurs Ladies Plain | 1 3/4 in Rowel | $21.89 | 21.89 |
| Spurs Men Plain | 2 in Shank Rowel | $21.95 | 21.95 |
| Spur Strap Harness | | 2 @ $ 4.60 per pair | 9.20 |
| Bit, Snaffle | 5″ @ M.6″ Cheek | 3 @ $10.95 each | 32.85 |
| Bit, Hackamore | Nose 6″ Cheeks | 1 @ $21.25 | 21.25 |
| Bit, High Port | 5″ w/ 8″ Cheeks | 1 @ $ 6.95 | 6.95 |
| Cinch Flank | 5″ Sleeve D/S Harness | 4 @ $35.60 each | 142.40 |
| Headstall | D & S Harness | 4 @ $23.50 each | 94.00 |
| Strings, Saddle | 1/2″×36″/6 pk | 1 @ $13.80 | 13.80 |
| Strings, Saddle | 12pk | 2 @ $23.00 each | 46.00 |
| Breast Collars | Russett | 4 @ $36.50 each | 146.00 |
| Bridle | 1 Ear 3/4″ D/S Cable | 4 @ $48.95 each | 195.80 |
| Chin Strap | Double Chain | 2 @ $ 4.75 each | 9.50 |
| Reins | Split/Plain Dark | 4 @ $25.00 each | 100.00 |
| Adjustable Tie Downs | | 4 @ $11.95 each | 47.80 |
| Halters | | 4 @ $20.95 each | 104.75 |
| Cinch Roper | 36″ 27 strand Rayon | 5 @ $13.95 each | 69.75 |
| Tie Straps | 1 3/4″ | 5 @ $13.00 each | 65.00 |
| Classic Rope Lariat | Med/Hard | 1 @ $36.00 | 36.00 |

| | | |
|---|---|---|
| Saddle Bag | 1 @ $51.40 | 51.49 |
| Curry Comb | 2 @ $ 4.69 each | 9.38 |
| Curling Comb | 2 @ $ 9.95 each | 19.90 |
| Brush/Rice Root Mix | 2 @ $16.99 each | 33.98 |
| Brush/Horse Hair Soft 6.5″ long | 2 @ $ 8.99 each | 17.98 |
| Comb, Scotch | 2 @ $ 2.69 each | 5.38 |
| Horse Hasp 14″ | 1 @ $23.50 | 23.50 |
| Nail Clincher | 1 @ $37.95 | 37.95 |
| Hoof Nipper | 1 @ $24.95 | 24.95 |
| Hoof Knife | 2 @ $ 2.84 | 5.68 |
| Hammer (for nails in horse shoes) | 1 @ $27.99 | 27.99 |
| Bulk Horse Shoes | 25 lbs @ $2.29 per pound | 57.25 |
| Horse Nails # 5 Slim Blad | (1) 500 count @ $36.75 | 36.75 |
| Sure Grip Whip | 1 @ $21.95 | 21.95 |
| Riding Crop | 1 @ $28.99 | 28.99 |
| | TOTAL | $1,820.27 |

(Pl.'s Ex. 19.)

In support of her opinion of the value of the horses and horse tack, the Plaintiff stated that she had been raising horses since 1996 and that she and the Debtor purchased the mustangs in 2001. (Tr. at 155.) As a basis for valuing the horses, she stated that she had perused newspapers and the internet. (Tr. at 163.) Introduced into evidence was Plaintiff's Exhibit 16, which contained copies of internet pages depicting advertisements for the sale of mustangs by other individuals. The exhibit reflected prices ranging from $1,000.00 to $2,000.00 per horse and $20,000.00 for a stallion.

The Plaintiff testified that in valuing her horses, she took into consideration their age, their weight, their breeding, and the fact that they were trained. She also introduced Plaintiff's Exhibit 17, which included copies of advertisements for saddles and their sale prices.

The Plaintiff stated that she had intended to keep the horses to breed in order to sell their offspring. Plaintiff's Exhibit 20 contains an estimate by the Plaintiff of money she anticipated earning from breeding the horses. The exhibit is difficult to follow but appears to indicate the Plaintiff anticipated she could make up to a total profit of $76,000.00 by breeding horses over a period of several years.

The Debtor disputes most of the Plaintiff's testimony concerning the horses. He testified that he went to his attorney's office and had a telephone conference with the Plaintiff, her attorney, and his attorney on November 4, 2004, concerning settlement of the divorce. He stated that he agreed he would take care of the horses for 60 days, but that the 60 days was to run from the date of the agreement on November 4, 2004, not December 14, 2004. The Debtor stated that he attended a court hearing on November 14, 2004, because the Plaintiff was backing out of the agreement made on November 4, 2004. (Tr. at 282.) He stated that the December 14, 2004, hearing held later was to enforce the previous agreement made in November. (Tr. at 283.)

The Debtor testified that he took care of the horses for a period of time. (Tr. at 285.) He stated, "I paid twice, I paid Barry Fisher for hay. One time was 100 dollars. One time I believe I give him 180 dollars." (Tr. at 285.) The Debtor stated he ceased caring for the horses on January 17, 2005 because "I had no more money."

(Tr. at 285.) He said he told the Plaintiff at Christmas 2004 that he could not afford to take care of the horses and that he would help her move the horses or sell them but that the Plaintiff declined, stating, "Don't worry about it. She had buyers for the horses." (Tr. at 286.)

He stated that when he stopped taking care of the horses, "[t]hey were in good shape. . . . They was not in A-number one top shape, but for a hard winter . . . they was in good shape." (Tr. at 287.)

The Debtor testified that he had lifelong experience with horses and that all the horses were alive, standing upright, and able to walk around when he ceased caring for them.

The Court further questioned the Debtor in regard to his efforts to care for the horses, and he responded with the following answers:

THE COURT: All right. And then you said that you ran out of money by January 17th and you quit taking care of the horses?

THE WITNESS: Yes, sir. I was actually out of money—borrowing money before then.

THE COURT: All right. And you just left them there?

THE WITNESS: I had no choice, Your Honor.

THE COURT: What did you think would happen to them if you didn't take care of them?

THE WITNESS: I was hoping that Mrs. Hamilton—we called the Humane Society and informed them I no longer had money to take care of these horses. We asked them to take them. Twice, they come out and looked at the horses and contacted Mrs. Hamilton. And she told them the horses were not hers.

THE COURT: Okay. But you knew if you didn't take care of them, they're going to die, didn't you? I mean, you're an experienced horseman?

THE WITNESS: Your Honor, in all honesty, I'm sorry, if they had been my horses, before I would have let my horses suffer, I would have put a bullet in them. That may sound cold, but it's better than letting them suffer.

THE COURT: Well, these were her horses. Why were you letting her horses suffer?

THE WITNESS: Your Honor, it was my understanding that my obligation at that point had already passed.

(Tr. at 325–326.)

The Debtor also disputes that the Plaintiff has the expertise to operate a horse breeding business and argues that the income she testified she would earn was merely speculative. He estimated that the horses were not valuable at all and that they ranged in price from $125.00 to $750.00 when originally purchased. (Tr. at 289.) He testified that he thought the horses were infected with a degenerative disease known as HTT, but never offered any competent evidence that the horses were so infected other than his own personal opinion.

The Debtor was dismissive of the Plaintiff's ability to develop a market to sell palomino quarter horses crossed with wild mustangs. He stated:

QUESTION: Would Nancy Hamilton be the type of person who could develop that market?

ANSWER: Doesn't have the knowledge.

QUESTION: All right. What knowledge, having been married to her for 20 years, what knowledge does she have of horses, from what you could see of her?

ANSWER: She has the knowledge to when I say, "Get a feed bucket and

bring me some feed. Hand me a curry comb."

QUESTION: Would she know how to break a horse?

ANSWER: She wouldn't know how to saddle it.

(Tr. at 306–307.)

Other witnesses called by the Debtor included Linda Fisher, the Debtor's aunt; Mary Holmes, the Debtor's mother; and Joy Bentley, the Debtor's sister. Ms. Fisher testified that the horses were kept at her place and that it was her husband who actually put hay out for the horses. The other witnesses testified that efforts were made to have the Plaintiff remove the horses in January 2005, as well as some unconvincing testimony as to the value of the horses.

## B.

### APPLICABLE LAW

■ The Bankruptcy Code provides that certain debts are excepted from a Chapter 7 discharge including a debt "for willful and malicious injury by the debtor … to the property of another entity." 11 U.S.C. § 523(a)(6). In order to prevail, the plaintiff must prove by a preponderance of the evidence that the debt resulted from a willful and malicious injury to the property of the debtor. *Grogan v. Garner,* 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Fischer v. Scarborough (In re Scarborough),* 171 F.3d 638, 641 (8th Cir.1999).

■ The United States Supreme Court has noted that Section 523(a)(6) of the Bankruptcy Code is based on the common law concept of intentional tort. *Kawaauhau v. Geiger (In re Geiger),* 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). The type of conduct that justifies denial of discharge under this section requires the same kind of intentional act that

would give rise to liability for an intentional tort; therefore, a reckless or negligent action does not rise to the level of a willful and malicious conduct. *Siemer v. Nangle (In re Nangle),* 257 B.R. 276, 282 (8th Cir. BAP 2001); *Mills v. Ellerbee (In re Ellerbee),* 177 B.R. 731, 739 (Bankr.N.D.Ga. 1995), *aff'd,* 78 F.3d 600 (11th Cir.1996). Injuries resulting from an accident are not considered willful and malicious in nature. *Hartwood Aviation, Inc. v. Hamilton (In re Hamilton),* 147 B.R. 779, 782 (Bankr. D.Colo.1992). The statute requires proof of two distinct elements; willfulness and maliciousness. *Fischer v. Scarborough,* 171 F.3d at 641; *Barclays American/Business Credit, Inc. v. Long (In re Long),* 774 F.2d 875, 880 (8th Cir.1985).

■ The word "willful" modifies the word "injury," indicating the statute requires "a deliberate or intentional injury." *In re Geiger,* 523 U.S. at 61, 118 S.Ct. 974; *In re Long,* 774 F.2d at 881. To prevail under this exception, the creditor must show that the debtor intended the injury or that the injury was relatively certain to result from the act. *In re Geiger,* 523 U.S. at 61, 118 S.Ct. 974; *In re Long,* 774 F.2d at 881; *In re Nangle,* 257 B.R. at 282.

■ The creditor must show that the debtor's act was malicious, that is, it was targeted at the creditor with intent to harm or with substantial certainty that the harm would occur. *Hobson Mould Works, Inc. v. Madsen (In re Madsen),* 195 F.3d 988, 989 (8th Cir.1999). To show malice, circumstantial evidence of the debtor's state of mind can be used. *Johnson v. Miera (In re Miera),* 926 F.2d 741, 744 (8th Cir.1991)(citing *In re Long,* 774 F.2d at 880–81).

## C.

### DISCUSSION

■ The Court's research failed to discover a case with similar facts. However, the evidence is very convincing that the

Debtor's failure to take proper care of the Plaintiff's horses as he had agreed was spiteful and done both willfully and maliciously within the meaning of 11 U.S.C. § 523(a)(6).

By the Debtor's own admission he stopped feeding and otherwise caring for the Plaintiff's horses on January 17, 2005. He argues in his testimony two justifications for his actions that are contradictory and, thus, cast doubt on the credibility of any of his testimony.

He argues first that the agreement for him to care for the horses for sixty days began to run on November 4, 2004, and that this was agreed to at a conference in his attorney's office where he was present with his attorney and the Plaintiff and her attorney, Ms. Ladd, were present via a telephone. Therefore, the Debtor argues the 60 days lapsed on January 4, 2005, and he had no responsibility to feed the horses after that date.

The Court does not find this explanation credible for several reasons. There was no corroborating evidence introduced that such a meeting took place; both the Plaintiff and her attorney dispute the testimony that any meeting took place on November 4, 2004. Further, this testimony about a November 4 agreement contradicts the specific written provisions of the divorce decree, which was dated December 14, 2004.

Second, counsel for the Debtor argues in his brief that proof that the Debtor cared for the horses for a period of time negates any intent on his part to harm the horses and that the Debtor was, at worst, negligent. However, the evidence is that the Debtor actually placed the burden of care

on his aunt's husband. The Debtor purportedly lived in Clarendon, Arkansas, during this period of time, and the Court judicially notes that it is at least 200 miles from Hackett, Arkansas, to Clarendon. Furthermore, the amount of money the Debtor claimed to have spent to feed and lodge the horses seems minimal.[2] By the Debtor's own admission, the horses were not fed from at least January 17, 2005, to February 14, 2005, when the Plaintiff attempted to take possession of the horses.

The Debtor also testified that the reason he ceased feeding the Plaintiff's horses on January 17, 2005, was that he ran out of money. Here again, he offered no corroborating evidence that he was without the necessary funds to fulfill his obligation. His bank statements show no appreciable difference in the amount of money being deposited and withdrawn in January 2005 and over other periods of time.[3] Furthermore, this seems an unlikely excuse since the evidence in the record is that the Debtor did not intend to care for the horses after January 17, 2005, because the lease on the pasture had expired. Additionally, he announced through his attorney that he was going to stop caring for the horses on January 17. That is precisely what he did, even though the Plaintiff's attorney indicated that the Plaintiff intended to hold the Debtor to his sixty-day agreement. The Debtor's actions, therefore, were premeditated and spiteful.

The Debtor professes to be an experienced horseman and would have to know that when he stopped feeding the horses in the middle of January in western Arkansas the horses would suffer and ultimately die of starvation. Notwithstanding an agreed

2. The Debtor testified that he spent $286.00 to rent the pasture where the horses were kept and $280.00 for hay for seven horses during what he described as a harsh winter. He also testified that he supplied some feed at a cost not shown by the record.

3. In fact, on January 6, 2005, the Debtor had on hand $2,290.53 and on February 6, 2005, had a balance remaining of $7,272.12. (Pl.'s Ex. 7E.)

Court Order to the contrary, the Debtor deliberately stopped feeding the horses on January 17, 2005. Therefore, the test of willfulness and maliciousness is met. The resulting debt in the form of damages is nondischargeable pursuant to 11 U.S.C. § 523(a)(6).

The Plaintiff's estimate of the fair market value of $40,840.00 for the miscellaneous tack and for the horses, including the horse named "Digger" valued at $20,000.00, appears reasonable and is supported by some corroborating evidence. The Debtor offered no credible evidence of his estimate of the value of the horses and the horse tack other than his uncorroborated testimony and that of some members of his family. The Debtor lacked credibility when he testified on other subjects, a fact that tends to support an inference of lack of credibility as to his valuation of the horses and tack as well.

The Plaintiff has the ultimate burden of proof to establish the amount of her claim, and she has met that burden. The debt is determined to be $40,840.00 for damages for the loss of the horses and tack.

 The Plaintiff also seeks damages for lost profits from a horse breeding business she intended to operate after she took possession of the horses. The Court has reviewed the Plaintiff's evidence carefully, but concludes that this aspect of her claim is speculative and, therefore, she is not entitled to an additional judgment for lost profits.

### IV.

### DEBT ARISING FROM NONSUPPORT PROPERTY SETTLEMENT

*11 U.S.C. § 523(a)(15)*

#### A.

#### FACTS

The Divorce Decree that was introduced into evidence provided that the Plaintiff was awarded certain personal property listed on an exhibit to the Decree. (Pl.'s Ex. 9.) A copy of that list is also attached as part of Plaintiff's Exhibit 21. The Plaintiff testified that she had not received any of the personal property so listed except for some movies. (Tr. at 135.) She testified the last time she saw the items was on February 4, 2003, at the house in south Ozark where the Debtor was living at the time.

Additionally, the Plaintiff stated that she was awarded the contents of a storage shed, which she said was located at 337 Carter Street in Clarendon, Arkansas. (Tr. at 137, 219.) Also, the Decree provided that the Debtor was responsible for any and all tax bills due the Internal Revenue Service (IRS) and that he would hold the Plaintiff harmless for those debts.

The Plaintiff itemized the personal property she never received in a two-page list introduced as Plaintiff's Exhibit 21. The Plaintiff estimated the value to each missing item, with the value of all the missing items totaling $17,305.00.

The Debtor admitted that he had agreed to give the Plaintiff everything in her possession and that "she'd get to have the van, the horses, trailers, tack, anything that was in the horse trailers or was at the farm . . . ." (Tr. at 278.) The Debtor testified, "[i]t was my understanding that it was her [Plaintiff's] storage shed, where she had went to the house after I had left, and anything that she had packed up and put in her storage shed was hers to keep." (Tr. at 304.) The Debtor further stated that the storage shed housing the missing items was "the one in Ozark at her [Plaintiff's] apartment or that she had rented" and was not his storage shed in Clarendon, which contained nothing other than his two sons' bicycles. (Tr. at 304.)

He stated that he was not in possession of any of the personal property listed on Plaintiff's Exhibit 21. Further, he testified that he had not sold any of the items and that he had not taken any of those items from the Plaintiff. The Debtor said the items remained in the house at Ozark when he vacated the premises after the parties had separated. (Tr. at 305.) He also stated that a shed on the Ozark property was full of tools and equipment including a four-wheeler and lawnmowers, and he had no idea what happened to these items.

The Debtor also offered into evidence the testimony of Teddy Hamilton, his 18–year–old son, in regard to the issue of missing personal property. (Tr. at 246.) Teddy Hamilton testified that he had not been in his mother's home since his parents' divorce and that he had lived with his father for four years while he was finishing high school. After examining Plaintiff's Exhibit 9, the list of the personal property the Plaintiff was entitled to receive under the divorce decree, Teddy Hamilton stated that he did not recall ever seeing any of those items in his father's home at any time during the past four years and that he did not know where the items were. He recalled there was a storage shed on the property in Ozark and that it contained lawnmowers and other items.

### B.

### APPLICABLE LAW

The Bankruptcy Code provides that a debtor may not exempt from discharge a nonsupport debt incurred by the debtor in the course of a divorce decree unless:

> (A) the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor and, if the debtor is en-
>
> gaged in a business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business; or
>
> (B) discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor.

11 U.S.C. § 523(a)(15)(A) & (B) (2000).

This Court examined this exception to discharge in an opinion that offered the following explanation:

> Thus, section 523(a)(15) excepts from discharge debts that are not for support but that arise out of divorce proceedings. *Moeder v. Moeder (In re Moeder)*, 220 B.R. 52, 54 (8th Cir. BAP 1998). The section provides two exceptions to this discharge exception, each of which will be discussed in turn below.
>
> In a cause of action to except nonsupport divorce debt from discharge, the nondebtor spouse has the initial burden of proving that the debt is one incurred in connection with a divorce and is in the nature of a property settlement debt rather than a debt for maintenance or support. *Strayer v. Strayer (In re Strayer)*, 228 B.R. 211, 214 (Bankr.S.D.Ind.1996)(citing *Gantz v. Gantz (In re Gantz)*, 192 B.R. 932 (Bankr.N.D.Ill.1996); *Florio v. Florio (In re Florio)*, 187 B.R. 654 (Bankr. W.D.Mo.1995); *Silvers v. Silvers (In re Silvers)*, 187 B.R. 648 (Bankr.W.D.Mo. 1995)).

*In re Sturdivant*, 289 B.R. 392 (Bankr. W.D.Ark.2003).

### C.

### DISCUSSION

The proof on this issue is not very substantial. The Plaintiff testified that the

last time she saw the missing items the Debtor had them and that he has failed to turn them over to her. The Debtor testified that he does not have the items and that the last time he saw them they were in the Ozark house that he vacated and that the Plaintiff subsequently had access to.

The Divorce Decree provided that the Debtor acknowledged that he had the computer, monitor, games and movies, and further provided that he would look for the other items on the list and deliver them to the Plaintiff if he could find them. The Decree also provided that the Plaintiff was awarded the "contents of the storage shed" but does not disclose the location of the shed. (Pl.'s Ex. 9 at 3.) The parties are not in agreement as to whether the storage shed referred to in the Divorce Decree was located at the former marital home near Ozark or at the Clarendon property. Both parties state the last time these items were seen they were in the home in Ozark which, at different times, was occupied by each of the parties after their separation.

■ The Plaintiff has the burden of proving a debt arising out of the divorce decree. On the record, the Court cannot find the evidence preponderates either way as to whether the Debtor had or has possession of the property and is, therefore, obligated to deliver the items or pay the Plaintiff their fair market value. Therefore, the Plaintiff has not carried her burden of proof on establishing that the Debtor is in possession of her personal belongings.

As to the Debtor's liability to the IRS, the Court declines to decide whether this obligation should be excepted from discharge under Section 523(a)(15) because it is unnecessary to do so. The Court has already denied the Debtor's discharge;

therefore, all the Debtor's debts, including the tax debt, are nondischargeable.

## V.

### *DEBT INCURRED BY FRAUD*

### *11 U.S.C. § 523(a)(2)(A)*

The plaintiff's fourth ground for objecting to the dischargeability of the Debtor's debts to the Plaintiff is based on 11 U.S.C. § 523(a)(2)(a), debts incurred by the Debtor by false pretenses, false representation, or actual fraud. The Court has carefully reviewed the evidence of these allegations and finds them without merit. In view of the Debtor's entire discharge being denied under 11 U.S.C. § 727(a)(4), an extended discussion of this section would unduly lengthen this Court's opinion.

## VI.

### *CONCLUSION*

Therefore, for the reasons stated herein, the Court will enter separate judgments as follows:

A. Judgment for the Plaintiff for willful and malicious injury to the Plaintiff's horses and horse tack in the sum of $40,840.00;

B. Judgment for the Debtor on the Plaintiff's claim for damages in the sum of $76,000.00 for the proposed horse breeding business;

C. Judgment for the Plaintiff for the value of the computer, movies and games in the sum of $3,000.00; judgment for Debtor on all other items of personal property;

D. Judgment for the Debtor on the Plaintiff's complaint to determine dischargeability pursuant to 11 U.S.C. § 523(a)(2)(A);

E. Judgment for the Plaintiff denying the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(4).

IT IS SO ORDERED.