**In re Stacie L. HAPPEL, Debtor.**

**William T. Neary, U.S.
Trustee, Plaintiff,**

**v.**

**Stacie L. Happel, Defendant.**

**Bankruptcy No. 07–21305–JES.
Adversary No. 07–2269.**

United States Bankruptcy Court,
E.D. Wisconsin.

Sept. 15, 2008.

Michelle S.Y. Cramer, U.S. Trustee, Milwaukee, WI, for Plaintiff.

Joseph M. Engl, Hanson & Payne, LLC, Robert K. Steuer, Milwaukee, WI, for Defendant.

## DECISION

JAMES E. SHAPIRO, Bankruptcy Judge.

The United States Trustee ("UST") has objected to a discharge being granted to Stacie L. Happel ("debtor") based upon § 727(a)(3) and § 727(a)(4)(A) of the Bankruptcy Code.

This adversary proceeding came on for trial on June 23, 2008. Following the testimony and receipt of exhibits, the court took this matter under advisement.

This is a core proceeding under 28 U.S.C. § 157(b)(2)(J). The court has jurisdiction pursuant to 28 U.S.C. § 1334.

### *FACTS*

What was revealed in this trial has the makings of a novel. The difference, however, is that the events in this case are real, not fictional.

Around September of 2004, the debtor met an individual named Michael Lock on a blind date. She knew that he was serving prison time on drug-related charges and was at that time on a work-release program from jail. Lock told the debtor that he was in the mortgage brokerage business, working as a loan officer. The debtor was working two jobs as a waitress. Soon after their first meeting, Lock proposed that they enter into a business arrangement for the purchase and sale of residential real properties. He told the debtor that, with her educational background, it would be more lucrative for her to become involved in this business arrangement instead of working as a waitress. She agreed to this arrangement and signed a written agreement prepared by Lock. The debtor testified at the trial that she wasn't sure she would call the business arrangement a partnership. However, upon further questioning by the UST, she acknowledged that in a discovery examination previously conducted by the UST she said: "We made an agreement. We made a partnership." Tr. at 23. The debtor further testified that Lock never gave her a copy of this agreement.

Under the agreement, it was Lock who located the properties to be purchased and who provided the debtor with addresses of the potential properties to be purchased. She then did drive-by inspections but never physically went inside any of the properties, except the Fiebrantz Avenue property where she later lived.

Seven (7) separate parcels of residential properties were purchased by Lock and the debtor, all of which were purchased in the debtor's name only. These purchases occurred over a period from January through June of 2005 and consisted of the following:

| Address | Date of Purchase | Purchase Price |
|---|---|---|
| 3323 North Richards Street<br>Milwaukee, WI | January, 2005 | $173,000 |
| 1918 North 13th Street<br>Milwaukee, WI | January, 2005 | $165,000 |
| 2838 North 11th Street<br>Milwaukee, WI | March, 2005 | $ 61,000 |
| 2951 North Buffum Street<br>Milwaukee, WI | March, 2005 | $165,000 |
| 3128 North 42nd Street<br>Milwaukee, WI | April, 2005 | $ 80,000 |
| 4900 West Fiebrantz Avenue<br>Milwaukee, WI | June, 2005 | $120,000 |
| 1023 West Sierra Lane<br>Mequon, WI | June, 2005 | $235,000 |

Lock made all the arrangements for obtaining the mortgage loans. He prepared the loan applications, all of which were signed only by the debtor. The debtor admitted that the information in each application was false and that she did not review any of them before signing. This false information included, among other things: her occupation (listed as a director of an entity known as Jasmine's Learning House Inc.) and her income (which was inflated in amount). As part of the processing of each loan application, Lock provided the debtor with money in the "thousands" of dollars (Tr. 41) which she then placed in her bank account. The purpose of doing this was to artificially inflate the amount in her bank account so that when it was verified by a prospective lender in connection with a loan application, it would increase the chances that the loan application would be approved. After a loan was approved, the funds which she received to inflate her account would then be returned to Lock. Lock instructed the debtor to attend each real estate closing and provided her with the necessary funds for closing costs. The debtor received $2,000 from each closing (with the exceptions of the Fiebrantz Avenue and Sierra Lane proper-

ties purchased). Lock told the debtor that she should "do what you want with the money." (Plaintiff Ex. 6 Tr. at 10) In a Rule 2004 examination conducted by the UST on August 14, 2007, she stated:

> This was like a side deal, I felt like it was a side deal with Michael Lock. He said I'm going to take care of all this stuff. You put it in your name, I'll give you $2,000 for it. I felt like I was making out in the end because he was doing all the fixing up, he was doing— but essentially it was me because that's where all the credit card debt came from. He used credit cards that were mine to fix up the properties and that's why those were all maxed out.[1] That's why there is so much credit card debt on here cause he used it to buy all the stuff to fix up the properties.

Plaintiff Ex. 6. Tr. at 11. This was the standard procedure followed in connection with the purchases of each of the properties, other than the Fiebrantz Avenue property (which the debtor purchased with her own funds) and the Sierra Lane property (which was intended to be Lock's residence). At this Rule 2004 examination,

---

[1] The total amount of the debtor's credit cards maxed out was in the range of $25,000 to $40,000.

when asked what her role was in this venture, the debtor responded:

My role was, I was signing the papers to own the properties and they were going to be taken care of for me for a year or so until the—until I could financial take care of them myself and then I would take over the role of owner and landlord.

Plaintiff Ex. 6. Tr. at 10.

The 11th Street property which was purchased by the debtor in March of 2005 for $61,000 was sold in October of 2005 for $90,000. $21,464.47 of the sale proceeds was turned over to "Lock Home Improvement—Michael Lock" without any records to justify the validity for this payment. In August of 2006, the 13th Street property, which had been purchased by the debtor for $165,000 in January of 2005, was sold for $35,000. When the debtor was asked why it was sold for so much lower than the purchase price, she responded that: "There was a fraudulent appraisal." (Tr. at 86) She later testified that the other appraisals which were obtained in connection with the purchases of homes were also fraudulent. (Tr. at 192–193)

In March of 2005, the debtor purchased a 2003 Cadillac Escalade automobile in her name to be used by Lock. Once again, the loan application in connection with the purchase of this vehicle falsely listed her occupation as "director at Jasmine's Learning House" at an annual salary of $60,000.

All of the other properties either went into foreclosure or were returned to the mortgagees in lieu of foreclosure. After Lock was again incarcerated[2] and after the business ceased operations, the debtor filed her bankruptcy petition on February 28, 2007. This was followed by the commencement of this adversary proceeding on October 22, 2007 and thereafter by the trial held on June 23, 2008.

### SEC. 727(a)(4)(A) CLAIM

■ In order to prevail under § 727(a)(4)(A) (false oath or account), the UST must prove:

1. debtor made a statement under oath,
2. which was false,
3. debtor knew statement was false,
4. the statement was made with a fraudulent intent, and
5. statement related materially to the bankruptcy case

*In re Beaubouef,* 966 F.2d 174, 178 (5th Cir.1992). Omissions from the bankruptcy schedules and Statement of Financial Affairs constitute a false oath for purposes of § 727(a)(4). *In re Hamilton,* 390 B.R. 618, 625 (Bankr.E.D.Ark.2008) ("Omissions from schedules qualify as a false oath as if they are made knowingly and with fraudulent intent."); *In re Glenn,* 335 B.R. 703, 707 (Bankr.W.D.Mo.2005); *In re Bostrom,* 286 B.R. 352, 360 (Bankr.N.D.Ill.2002).

■ The record in this case shows that the debtor made numerous omissions, including:

1. Debtor's failure to disclose her business arrangement with Lock in Question # 18 of her Statement of Financial Affairs. Regardless of whether this arrangement was, as the debtor testified in her deposition held by the UST, a partnership or some other type of business arrangement, she held a proprietary interest in this business venture involving purchases and sales of parcels of real estate. Question # 18 of her Statement of Financial Affairs asks the debtor to reveal any business she operated within six (6) years of the filing of her

---

**2.** Lock was recently convicted in state court on charges of homicide, kidnapping, and drug dealing and sentenced to life in prison. He is also facing additional criminal charges, including a federal charge of mortgage fraud.

bankruptcy petition, but she failed to do so. Her only references to Lock in her bankruptcy schedules and Statement of Financial Affairs appear in Schedule "F" (Creditors Holding Unsecured Nonpriority Claims) as follows:

| CREDITOR'S NAME | DATE CLAIM WAS INCURRED | AMOUNT OF CLAIM |
|---|---|---|
| Michael Lock<br>4343 North 15th Street<br>Milwaukee, WI 53209 | 2004 thru 2005 (est.)<br>Goods & Services | Unknown |

and in Schedule "H" where she listed Lock as a co-debtor on a debt to Target National Bank. Nothing in her bankruptcy schedules or Statement of Financial Affairs makes any reference to her ill-fated business venture with Lock.

2. Debtor also omitted information from her Statement of Financial Affairs in Question #1 in failing to reveal income received from all sources, including income from the operation of her business venture with Lock. She was required to disclose in Question #1 the gross amount of all income she received from her business operations with Lock, even if the business was operated at a loss. The disclosure which she made in Question #1 is woefully incomplete. It failed to include any rentals received from tenants at the various properties purchased. It also failed to list the $2,000 which she received after each real estate closing and further omitted the sale of the 11th Street property.

3. Although the debtor listed in Question #10 of her Statement of Financial Affairs transfers of the Buffum Street, 42nd Street, Richards Street, and 13th Street properties, she failed to include the sale of the 11th Street property.

These omissions from her schedules and Statement of Financial Affairs are not trivial. They are all material to this case and prevented the chapter 7 trustee and the creditors from exploring potential recoveries of assets for the bankruptcy estate, including a potential fraudulent conveyance action in connection with the disbursement of $21,464.47 made to Lock from the sale of the 11th Street property.

■ The debtor claims that the omitted information was revealed to her bankruptcy counsel[3] before the bankruptcy petition was filed. However, that does not provide her with a safe harbor. She had a duty to be more careful in reviewing her bankruptcy petition, schedules, and Statement of Financial Affairs before she signed them, but failed to do so. Reliance on counsel in completing the statement of financial affairs and schedules is no defense to material misrepresentations unless such reliance was reasonable and in good faith. *In re Eppers,* 311 B.R. 826, 832–33 (Bankr.D.N.M.2004). If indeed the debtor did rely on her counsel, it was neither reasonable nor in good faith.

■ The debtor also contends that nothing in this case suggests that a trustee or creditors would have obtained from the information which was omitted anything which would in turn have been helpful in recovering assets for this bankruptcy estate. That may well be true. However, the value of the assets omitted is not the focus of the inquiry. Rather, it is the veracity of the debtor's statements which is paramount. *In re Milam,* 172 B.R. 371, 375 (Bankr.M.D.Fla.1994); *see also In re Chalik,* 748 F.2d 616, 618 (11th Cir.1984) (stat-

3. Attorney Robert Steuer, who represents the debtor in this adversary proceeding, was not the attorney who represented the debtor and prepared her bankruptcy petition.

ing that the materiality of a false oath does not depend upon whether the falsehood is detrimental to creditors); *In re Calder,* 93 B.R. 734, 738 (Bankr.D.Utah 1988) (declaring that a debtor may not escape the denial of discharge by making a false oath merely by asserting that the business relationships or holdings omitted were worthless). The court also is persuaded that the debtor knew that her material omissions were false and that such omissions were done with a fraudulent intent on her part. Fraudulent intent is difficult to establish because generally the debtor is the only person able to testify as to his or her intent and who is unlikely to admit any fraudulent intent. *In re Abramov,* 329 B.R. 125, 131 (Bankr.E.D.N.Y.2005). The following excerpts from the transcript of the trial are illustrative of why this court concludes that the debtor's actions were fraudulent:

> Question: Did you think it was important to have a copy of the agreement?
>
> Answer: Not at the time.

Tr. at 24–25.

> Question: Did you think you could go to the bank and anyone could get a loan for a home?
>
> Answer: Yes.
>
> Question: Have you ever tried?
>
> Answer: No.
>
> Question: Would you say it was as easy as buying a big screen tv?
>
> Answer: Yes.

Tr. at 30–31.

> Question: At any point during this transaction did it concern you that you were negotiating, working, and revealing financial information to a convicted felon?

> Answer: No.

Tr. at 33–34.

> Question: ... you considered it standard practice to artificially inflate your bank balance?
>
> Answer: I was only doing what he [Lock] asked me to do. I didn't question anything he asked me to do?

Tr. at 42–43.

> Question: In January of 2005, you stated that your income on a monthly basis was $5,375?
>
> Answer: I didn't review the application. I just put my initial on it.
>
> Question: Did you think it was important to review the application?
>
> Answer: No.

Tr. at 61.

> Question: You didn't disclose North 11th Street on your schedules did you?
>
> Answer: No.
>
> Question: Why not?
>
> Answer: Because I forgot about it.

Tr. at 190.

> Question: Miss Happel. He's [Lock] a convicted felon when you meet him and he had an ankle bracelet on. A reasonable person in your similar circumstances would say that there might be some reason to have concerns. Did that ever cross your mind?
>
> Answer: No.

Tr. at 195.

Even if the debtor lacked a conscious intent to deceive, the record is clear that her conduct clearly evinced a reckless disregard for the truth. *In re Saylor,* 339 B.R. 190, 191 (Bankr.N.D.Ind.2006), declared that a conscious intent to deceive is not always required for purposes of § 727(a)(4). Similarly, the court in *Abramov* declared that a fraudulent intent under § 727(a)(4) also exists where a debtor has demonstrated "a reckless disregard of

both the serious nature of the information sought and the necessary attention to detail and accuracy" regarding statements made (or, as in this case, omitted statements) under penalties of perjury. 329 B.R. at 134. In *Saylor,* the court, citing *In re Yonikus,* 974 F.2d 901, 905 (7th Cir.1992), stated that a debtor's reckless disregard for the truth of the information contained in bankruptcy statements and schedules is sufficient to bar a discharge and is the equivalent of actual fraud on the part of the debtor submitting such false or inaccurate statements. 339 B.R. at 191.

Although the debtor may not have been sophisticated in business dealings, she is intelligent. She holds a Bachelor of Science degree in math education and is currently employed by the State of Wisconsin Department of Corrections as a payroll and benefits specialist where she has worked since August of 2006.

The court fully recognizes that, after the debtor became involved in this business scheme with Lock, it would have been difficult for her to simply walk away. In her testimony, she described in one word her feelings towards Lock as "fear." (Tr. at 182) However, that is no defense for her failure to include the key omitted information from her bankruptcy schedules and Statement of Financial Affairs. She was a victim, to be sure, and was taken advantage of and manipulated by Lock, but she is not an innocent victim.

The UST has established by a preponderance of the evidence the necessary elements required under § 727(a)(4) for denial of debtor's discharge.

### SEC. 727(a)(3)—FAILURE TO KEEP OR PRESERVE RECORDS

■ Sec. 727(a)(3) provides a separate basis for denial of her discharge.

■ Under § 727(a)(3), a debtor shall not receive a discharge where such debtor has concealed, destroyed, falsified *or failed to keep or preserve records* from which the debtor's financial condition or business transactions may be ascertained (emphasis added). Under this section, after an objecting party has established by its *prima facie* case that the records are insufficient to ascertain the debtor's financial condition and/or personal transactions, the burden of going forward then shifts to the debtor to introduce additional credible evidence to refute the proof of insufficient records or to justify the absence of such records. *In re Gardner,* 384 B.R. 654, 662 (Bankr. S.D.N.Y.2008).

The UST has established a *prima facie* case, and the debtor has failed to introduce credible evidence required to rebut such proof of insufficient records or justify the absence of such records. She has failed to explain why she does not have the necessary records needed to enable a trustee and creditors to trace her financial history, business, and personal finances and to reconstruct the debtor's financial transactions as is required. *In re Scott,* 172 F.3d 959, 969 (7th Cir.1999); *In re Juzwiak,* 89 F.3d 424, 427–28 (7th Cir.1996). The debtor admitted in the trial that her records were incomplete. She also admitted having received money in the thousands of dollars from Lock, which she placed in her bank account and that she was unable to identify the source of these payments. She further acknowledged that she did not have any ledger in connection with the business operations. She was unable to explain why the $21,464.47 payment was made to "Lock Home Improvement—Michael Lock" from the sale proceeds of the 11th Street property. The debtor's only records are her bank accounts, which are insufficient for purposes of § 727(a)(3). The court, in *In re Juzwiak,* 89 F.3d at 428, declared that a checking account, bank statements, cancelled checks, and tax

returns do not enable a creditor to reconstruct various transactions or to track the financial dealings of the debtor with any degree of competence or accuracy.

 Fraudulent intent is not required under § 727(a)(3). *Juzwiak,* 89 F.3d at 430; *In re Scott,* 172 F.3d at 969. A debtor's sophistication and business experience, or lack thereof, is a relevant factor in determining if there is a violation of this section, but is not controlling. Even an unsophisticated debtor must keep available written evidence from which that debtor's financial condition and business transactions can be ascertained. *In re Tran,* 297 B.R. 817, 835 (Bankr.Fla.2003). Trustees and creditors are not required to undertake an independent investigation of a debtor's affairs or to speculate as to her financial history or her condition or sift through documents in order to attempt to reconstruct the flow of such assets.

The court is persuaded that the grounds for denial of discharge under § 727(a)(3) have been established by a preponderance of the evidence.

### CONCLUSION

Based upon the foregoing, the court denies the debtor's discharge under §§ 727(a)(4)(A) and 727(a)(3) of the Bankruptcy Code.

This decision constitutes the court's findings of fact and conclusions of law pursuant to Federal Bankruptcy Rule 7052.

A separate order for denial of discharge shall be issued.

A copy of this decision is being referred to the Office of the United States Attorney for the Eastern District of Wisconsin for its review and determination if criminal prosecution is warranted.